**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JEFFREY LEONARD, IN HIS CAPACITY AS TRUSTEE OF THE POPLAWSKI 2008 INSURANCE TRUST; PHYLLIS POPLAWSKI; and PBR PARTNERS, on behalf of themselves and all others similarly situated <br><br> Plaintiffs, <br><br> vs. <br><br> JOHN HANCOCK LIFE INSURANCE COMPANY OF NEW YORK  and JOHN HANCOCK LIFE INSURANCE COMPANY (U.S.A.) <br><br> Defendants. | Civil Action No. <br><br> <u>**CLASS ACTION COMPLAINT**</u> <br><br> <u>**JURY TRIAL DEMANDED**</u> |

Plaintiffs, on behalf of themselves and all others similarly situated, for its Complaint against defendants John Hancock Life Insurance Company of New York ("JHNY") and John Hancock Life Insurance Company (U.S.A.) ("JHUSA" and, together with JHNY, "John Hancock" or "Hancock"), states as follows:

<u>**NATURE OF THE ACTION**</u>

1.      This is a class action brought on behalf of Plaintiffs and similarly situated owners of life insurance policies issued by John Hancock and its predecessors ("John Hancock policies").  Plaintiff seeks to represent a class of John Hancock policyholders who are being subjected to an unlawful and excessive cost of insurance ("COI") increase by John Hancock in violation of their insurance policies.

2.      The policies at issue are all universal life policies ("UL policies").  The principal benefit of UL policies is that, unlike other kinds of whole life insurance that require fixed monthly premium payments, the premiums required for UL policies are flexible and need only

be sufficient to cover the COI charges and certain other specified expenses.  The COI charge is typically the highest expense charge that a policyholder pays. As a result, the provision in the policy explaining how and when COI charges can be adjusted is one of the most important terms of the contract.

3.     In February 2018, John Hancock's parent company, Manulife Financial Corporation (which reports on behalf of John Hancock in consolidated statements), announced that it had a $1.6 billion net loss in the fourth quarter of 2017. At the same time, Manulife also reported that its 2017 net income attributed to shareholders decreased by $825 million, as compared to 2016. In February 2018, the press reported that Manulife has been trying to sell "parts of its life insurance operations" in the United States, which "it regards as unattractive from a returns prospective." And in November 2017, on an earnings call, Manulife's CEO acknowledged that the company's North American legacy business (which on information and belief includes the policies hit by this increase) is "generating returns that are less than acceptable." On this November 2017 earnings call, Manulife's CEO Roy Gori further said that Manulife's "number one" priority is to "aggressively manage" its legacy blocks to "**increase profitability** and cash generation," and that "shareholder returns" will be a big part of how Manulife measures "progress in our legacy business."

4.     In May 2018, John Hancock sent a cryptic letter to policyholders notifying them of a massive increase in COI rates and charges on certain "John Hancock Performance Universal (UL) Life insurance policies." The amount of the new COI rate increase and the actuarial justifications for it were not disclosed.  John Hancock disclosed only that it had "completed a review" of these policies, and "[a]s a result of this review, our expectation of future experience has changed, and therefore the Cost of Insurance rates on your Performance UL policy will be

increasing." John Hancock's filings with state regulators reveal that a major driver of the increase was to meet its "various profit objectives."

5.     Subsequent disclosures and investigation reveals that John Hancock told its agents in May 2018 (but not policyholders) that "since January 2017," John Hancock has "been unable to provide inforce illustrations on about 4,000 Performance UL policies issued between 2003 and 2010," and after "a review of emerging experience," decided to increase COI rates on "a subset of those policies," resulting in a rate hike on "approximately 1,500 policies." John Hancock did not disclose why it chose to select those 4,000 policies for review, nor why it chose to increase rates on only 1,500 of them. John Hancock disclosed to its agents only that "as a result of changes in our expectations of future mortality and lapse experience, we will be increasing the Cost of Insurance rates on a subset of these policies," and "the amount of the increase will vary by policy." And contrary to what John Hancock told its agents, the increase was imposed on some policies for which John Hancock continued to provide inforce illustrations well past January 2017.

6.     The COI increase is massive. For example, in the case of one plaintiff, Ms. Poplawski, the insured took out a policy on her own life in 2008, and after paying 10 years of premiums at John Hancock's "projected" rates, John Hancock suddenly increased her COI rates by approximately 70% per year, causing her trust to have to pay approximately $225,000 more in premiums *per year* to keep her insurance coverage.  She is now 86 years old, at an age when finding suitable replacement insurance is prohibitively expensive.

7.     Other policyholders have seen increases ranging from 17% to at least 71%, and there is no reason given by John Hancock for the wildly disparate COI increases.

8.     The COI Increase is unlawful. Under the terms of the policies at issue (the "Subject Policies"), cost of insurance rates "will be based on our expectations of future mortality, persistency, investment earnings, expense experience, capital and reserve requirements, and tax assumptions."[1]  Plaintiffs COI increases are as high as 71%– far beyond what the enumerated factors in the policy could justify.  John Hancock's letter to agents indicated only that the COI increases were being increased "as a result of changes in our expectations of future mortality and lapse experience." But mortality expectations have continued to improve, which should have led to a decrease in rates, and John Hancock's allegedly deteriorating lapse experience cannot justify any increase, much less one of this size. Further, in devising the COI increase, John Hancock ignores other enumerated factors that should have led to *lower* COI rates, such as its recently announced expectation that the U.S. tax cuts will save it $240 million per year going forward. John Hancock cannot ignore the enumerated factors that benefit John Hancock – like its expectation of "tax assumptions" – just because they would lead to cheaper COI rates. And if it had considered this massive tax benefit, no COI rate hike of this massive size could be warranted. John Hancock also admits that the increase was driven by John Hancock's desire to "increase profitability," but increased profitability – or even meeting its profit objectives – is not one of the enumerated factors that a COI rate increase can be "based on" under the explicit terms of the Subject Policies.

9.     John Hancock told regulators as recently as February 2016 that its expectations did not warrant any change in projected COI rates. Moreover, John Hancock regularly sends policyholders a report on the "projected future values" for their policy, and the policies promise

---

[1] Some Subject Policies have a minor and immaterial variation in this language, stating that COI rates (also called "Applied Monthly Rates") "will be based on our expectations of future investment earnings, persistency, mortality, expense and reinsurance costs and future tax, reserve and capital requirements."

that policyholders will receive these reports "upon request." Prior to the COI increase, named plaintiffs have received these reports (called illustrations) from John Hancock at least as recently as February 2018, in which John Hancock "projected" that the *old, cheaper* COI rates would continue for the life of the policy. And then, JH suddenly raised rates in May 2018. But nothing has changed in the last few years since that time that would justify this massive COI increase. Mortality—by far the biggest driver of COI rates—has been improving industry-wide at a rate of approximately 1% per year. And lapse rates are relatively stable industry wide, especially for policies, like all Subject Policies, that have been in force for at least 8 years.

10.    Similarly, the Subject Policies require that the COI rates "will be reviewed at least once every 5 Policy Years" or "from time to time." The purpose of this provision – like the regulatory statement and the illustration provision discussed above – is to prevent the insurer from engaging in a bait-and-switch tactic, where it projects cheaper COI rates in the future, collects premiums, and then turns around many years later and reveals that COI rates will be raised far above projections because of changed expectations that, if the insurer's story is to be believed, the insurer must have known about for a long time. But if John Hancock's story is to be believed, that is exactly what John Hancock did, in violation of these policies. John Hancock tells regulators that it regularly updates its mortality expectations, generating "anticipated mortality experience [that] is allocated by risk classification across all product lines." If John Hancock's expectations deviated so dramatically from its original expectations, then it must have known about this for a long time, and was forbidden from keeping this a secret and springing it on policyholders after they paid premiums for at least 8 years.

11.    The increase was also designed to recoup past losses, in violation of basic actuarial principles and the policy language requiring increases to be responsive to expectations of

"future" experience. The increase is designed to increase profitability on a block of business that John Hancock claims to have lost money on, and the increase is part of John Hancock's "aggressive" efforts to make up for these past losses. Further, any alleged change in John Hancock's mortality and lapse expectations occurred many years ago, and John Hancock cannot recapture past losses by imposing a massive increase now as a result of alleged changed expectations that, to the extent there have been changes, it recorded on its books many years ago.

12.     The increase also was not uniform among policyholders. The policies promise that any increase will be "on a basis that does not discriminate unfairly within any class of lives insured" or "made on a uniform basis for insureds of the same sex, Issue Age, and premium class, including smoker status, and whose policies have been in force the same length of time." The increase breaches both of these provisions for the same reason: John Hancock is applying increases to some PUL policies and not others, and applying wildly different increase amounts on those policies that they are picking on, without any contractual or acceptable actuarial reason for that discrimination.

13.     Tellingly, John Hancock did **not** implement the COI Increase on other products that John Hancock issued between 2003 and 2010, despite the fact that John Hancock tells regulators that its mortality experience is "allocated across product lines." This is because the true reason for the increase is not changes in mortality or lapse experience, as John Hancock claims, but because John Hancock wants to force lapses on policies that John Hancock now thinks are ripe for an increase in profit margins, even though the older age insureds have nowhere to turn for a new policy after paying premiums on these for years.

14.     Making matters worse, in violation of the policy provision that promises illustrations "upon request," John Hancock refused to provide accurate illustrations for Subject

Policies beginning in January 2017 and through May 2018, which would have helped the insureds make investment and estate planning decisions earlier.

15.    The COI rate hike and John Hancock's actions preceding it therefore breached the John Hancock policies in at least five respects:

        a.    Increases were not based upon enumerated factors;

        b.    Increases were non-uniform and discriminatory;

        c.    Increases were designed to recoup past losses rather than respond to future expectations;

        d.    Illustrations provided to the plaintiffs were not based on John Hancock's expectations of future mortality, persistency, investment earnings and other permitted enumerated factors and therefore were not a valid projection of future values; and

        e.    John Hancock refused to provide an illustration on a policy upon request.

## THE PARTIES

16.    Plaintiff Jeffrey Leonard, in his capacity as Trustee of The Poplawski 2008 Insurance Trust (a "Poplawski Plaintiff" of the "Poplawski Trust"), is a trustee of the Poplawski Trust, which holds in trust a John Hancock PUL policy insuring the life of plaintiff Phyllis Poplawski (together with the trustee, the "Poplawski Plaintiffs"), with the policy number 93735017 (the "Poplawski Policy"). On February 21, 2008, John Hancock issued the Poplawski Policy with a face amount of $10,000,000, insuring the life of Phyllis Poplawski, age 76 at the time of issue, and designating the Poplawski Trust, Jeffrey Leonard, as the owner. The policy was issued in the state of California. In May 2018, after paying 10 years of premiums, and at the age of 86, Ms. Poplawski and the trustee received notice stating that her COI rate was increasing,

which would cause her to lose her existing insurance coverage unless she raised her premiums substantially. Ms. Poplawski was 86 years old at the time of COI increase, and a resident of California throughout all relevant times since policy issuance. Along with the notification of the increase, the Poplawski Plaintiffs received an illustration showing the projected performance of the policy under non-guaranteed and guaranteed assumptions. The illustration demonstrates that the COI increases will have a devastating impact on the policy, rendering it all but worthless in a very short time absent paying a 70 percent increase in the annual premium.

17.     Plaintiff PBR Partners is a New York general partnership, with a principal business address at East 71st St, New York, NY, 10021. PBR is the owner of a PUL insurance policy hit by the COI Increase on an insured with the surname Jacobs ("Jacobs policy"), who was 73 years old when the policy issued in 2006. The Jacobs policy was issued and delivered in New York by JHNY, and has a face amount of $10,000,000. The Jacobs policy is having its rates increased by 17%.

18.     John Hancock Life Insurance Company of New York ("JHNY") is a corporation organized under the laws of New York and has its principal place of business in Valhalla, New York. On January 1, 2010, approximately $7.3 billion of life insurance, fixed annuity, and variable annuity reserves and liabilities related to policyholders who resided in New York, including the assets supporting the business, were transferred from JHUSA to JHNY. JHNY, or its predecessors, issued and holds many of the policies hit by the COI Increase.

19.     John Hancock Life Insurance Company (U.S.A.) ("JHUSA") is a stock life insurance company organized under the laws of the state of Michigan, with its principal offices in Boston, Massachusetts. JHNY is a wholly owned subsidiary of JHUSA, a Michigan life insurance company. The ultimate parent of the JHUSA and JHNY is Manulife Financial

Corporation ("Manulife"), a Canadian-based insurance and financial services holding company. JHUSA, or its predecessors, issued and holds many of the policies hit by the COI Increase.

## JURISDICTION AND VENUE

20.    This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1332(d) because this is a class action with diversity between at least one class member and one defendant and the aggregate amount of damages exceeds $5,000,000.  JHNY is incorporated and has its principal office in New York; JHUSA is incorporated in Michigan and has principal office in Massachusetts. Plaintiffs are citizens of several states, as set forth above, and unnamed class members are citizens of states across the United States.  This action therefore falls within the original jurisdiction of the federal courts pursuant to the Class Action Fairness Act, 28 U.S.C § 1332(d).

21.    This Court has personal jurisdiction over John Hancock because JHNY is a citizen and resident of this state, and the decision to raise COI rates was made jointly by JHNY and JHUSA, and announced jointly by both companies in a uniform letter. The uniform letters to policyholders announcing the COI increase state that the "Insurance products are issued by" JHNY in New York and JHUSA, and refers to both entities "collectively … as John Hancock." The notice of the COI increase for the Jacobs policy was sent by John Hancock to PBR Partners' business address in Manhattan.

22.    Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)-(c) because the events giving rise to Plaintiffs' causes of action occurred in this District, including the COI overcharge, which was imposed on PBR Partners in Manhattan.

## FACTUAL BACKGROUND

### A.    The Policies at Issue

23.     The policies at issue are UL policies issued by John Hancock between 2003 and 2010.  These policies are all flexible-premium, universal life policies, and there are no fixed or minimum premium payments specified in the policies.  The principal benefit of UL policies is that they permit policyholders to pay the minimum amount of premiums necessary to keep the policies in force. Unlike other kinds of whole life insurance that require fixed monthly premium payments, the premiums required for UL policies need only be sufficient to cover the COI charges and certain other specified expenses. The COI charge is typically the highest expense that a policyholder pays.  The COI charge is deducted from the policy account (i.e., the savings component) of the policy on a monthly basis, so the policyholder pays the COI charge entirely to John Hancock. Any premiums paid in excess of COI charges and expense components are applied to a policy's policy account, sometimes known as "account value" or "cash value." These excess premiums earn interest. This structure is beneficial because it allows policyholders to minimize their capital investment and generate greater rates of return through other investments. Depending on the interest rate environment and the credited rate, other policyholders may choose to heavily fund their policies and use the interest to pay COI charges and grow the account value.

24.     The size of the COI charge is highly significant to Plaintiffs and all UL policyholders for at least two important reasons. First, it dictates the minimum amount of money that must be paid to keep a policy in force.  Second, high COI rates can quickly diminish a policy's account value and reduce the amount of money on which interest can be earned.  Absent a secondary guarantee, if a policy account value diminishes such that COI charges can no longer be deducted, and the appropriate time expires after John Hancock provides an accurate and adequate grace notice, then a policy will lapse unless additional premiums are paid in.

25.     Each of the Subject Policies has substantively identical language regarding how the COI rates will be determined.  One set of policies provides:

> The Applied Monthly Rates are the actual rates used to calculate the Cost of Insurance Charge. We will determine the Applied Monthly Rates to be used for this policy. The Applied Monthly Rates **will be based on our expectations of future investment earnings, persistency, mortality, expense and reinsurance costs and future tax, reserve and capital requirements** and … will never be greater than the Maximum Monthly Rates shown in Section 2 divided by 1,000…. **They will be reviewed at least once every 5 Policy Years. Any change in Applied Monthly Rates … will be made on a uniform basis for insureds of the same sex, Issue Age, and premium class, including smoker status, and whose policies have been in force the same length of time.**[2]

A second set of policies provides:

> The Cost of Insurance Charge for a specific Policy Month is the charge for the Net Amount of Risk, including any Additional Ratings and any Supplementary Benefit riders which are part of the policy. The charge for the Net Amount at Risk is an amount equal to the per dollar cost of insurance rate for that month multiplied by the Net Amount at Risk, and **will be based on our expectations of future mortality, persistency, investment earnings, expense experience, capital and reserve requirements, and tax assumptions**. The Maximum Monthly Rates at any age are shown in Section 2 as a rate per \$1,000 of Net Amount at Risk. To get the maximum rate per dollar, the rate shown must be divided by 1,000. Each Cost of Insurance Charge is deducted in advance of the applicable insurance coverage for which we are at risk… **We review our Cost of Insurance rates from time to time, and may re-determine Cost of Insurance rates at that time on a basis that does not discriminate unfairly within any class of lives insured**.

26.     On information and belief, all polices hit by the COI increase contain materially the same terms as above.  The policies at issue are all form policies, and insureds are not permitted to negotiate different terms.  They are all contracts of adhesion.

**B.      John Hancock's Unlawful COI Increase**

27.     In May 2018, John Hancock sent a cryptic, uniform letter to policyholders notifying them of a massive increase in COI rates on certain "John Hancock Performance

---

[2] All emphases added unless stated otherwise.

Universal (UL) Life insurance policies." The amount of the new COI rate increase and the actuarial justifications for it were not disclosed.  John Hancock disclosed to policyholders only that it had "completed a review John Hancock Performance Universal (UL) Life insurance policies," and that "[a]s a result of this review, our expectation of future experience has changed, and therefore the Cost of Insurance rates on your Performance UL policy will be increasing." In the letter, John Hancock refers to the COI increase as a "premium increase." The letter warns that if the policyholder does not increase its premiums or reduce the death benefit, the "policy will not remain inforce as originally projected."

28.     John Hancock gave slightly more information to its agents than to its policyholders, explaining to its agents:

> "[S]ince January 2017, we have been unable to provide inforce illustrations on about 4,000 Performance UL policies issued between 2003 and 2010, pending a review of emerging experience. That review is now complete and we are now able to provide inforce illustrations on all Performance UL policies. Also, as a result of changes in our expectations of future mortality and lapse experience, we will be increasing the Cost of Insurance rates on a subset of these policies. Overall, this increase impacts approximately 1,500 policies, and the amount of the increase will vary by policy. … We are sending letters to all affected policyholders to inform them of the increase …"

29.     The size of the COI Increase varies wildly among those targeted for the increase, and John Hancock does not explain that variance or even tell policyholders the size of their increase. For example, John Hancock did not tell Ms. Poplawski how much she had to raise her premiums to keep her policy in place. But reverse engineering the John Hancock illustrations shows that the Poplawski trust will have to pay approximately 70% per year more to keep the policy in force as a result of the COI increase – approximately $220,000 more annually. John Hancock provided no explanation for this massive increase above what had been her "projected" COI rates, even after large premiums had been paid on the policy for 10 years as part of her estate plan.

30.     Despite this limited information, it is clear that the COI Increase violates the terms of the Subject Policies in at least the following ways.

**(i)     The COI Increase Was Not Based on the Enumerated Factors**

31.     The John Hancock contracts governing the Subject Policies state (with minor variation) that the COI rates "will be based on [John Hancock's] expectations of future mortality, persistency, investment earnings, expense experience, capital and reserve requirements, and tax assumptions."[3]

32.     John Hancock has pointed to only 2 factors to justify the increase: "changes in [John Hancock's] expectations of future mortality and lapse experience." Not only does John Hancock ignore positive changes in some enumerated factors (like "tax assumptions"), but also changes in these two factors could not possibly warrant an increase, much less one of this massive size.

**a.  Expectations of Future Mortality Experience Have Improved**

33.     Beginning at least as early as 1980, the National Association of Insurance Commissioners (NAIC) has issued a series of mortality tables, which reflect expected mortality rates for insureds derived from data collected from insurance companies. The 1980 table issued by the NAIC was called the 1980 Commissioners Standard Ordinary Smoker or Nonsmoker Mortality Table ("1980 Mortality Table"). Industry expectations of mortality experience have improved each year since the 1980 table issued.

34.     In 2001, at the request of the NAIC, the Society of Actuaries (SOA) and the American Academy of Actuaries (Academy) produced a proposal for a new CSO Mortality Table. The accompanying report from June 2001 explained that (a) the 1980 CSO Mortality

---

[3] The policies also refer to COI rates as "Applied Monthly Rates."

Table was commonly used in the industry and (b) mortality rates and expectations had improved significantly each year since the 1980 table issued.  The report stated:

> The current valuation standard, the 1980 CSO Table, is almost 20 years old and mortality improvements have been evident each year since it was adopted . . . . [C]urrent mortality levels . . . are considerably lower than the mortality levels underlying the 1980 CSO Table.

35.     The report further explained that "[f]or most of the commonly insured ages (from about age 25 to age 75), the proposed 2001 CSO Table mortality rates are in the range of 50% to 80% of the 1980 CSO Table." The final proposed tables were adopted as the 2001 Commissioners Standard Ordinary Mortality Table ("2001 CSO Mortality Table").  The 2001 CSO Mortality Table reflected vastly improved mortality experience and expectations as compared to the 1980 CSO Mortality Table.

36.     The 2001 CSO Mortality Table was generated from the 1990-95 Basic Mortality Tables published by the Society of Actuaries. The Society of Actuaries performs surveys of large life insurance companies for the death rates actually observed in their policies and compares these to published mortality tables. Periodically the Society will publish an updated table to reflect the evolving industry experience and expectations. Major updates they have published over the last few decades include:

- 1975-1980 Basic Select And Ultimate Mortality Table
- 1985-90 Basic Select and Ultimate Mortality Tables
- 1990-95 Basic Select and Ultimate Mortality Tables
- 2001 Valuation Basic Mortality Table
- 2008 Valuation Basic Table
- 2015 Valuation Basic Table

37.     The 1990-95 Basic Table reflected the death rates observed by 21 large life insurance companies (including John Hancock) with policy anniversaries between 1990 and 1995. The 2001, 2008 and 2015 Valuation Basic tables each show significant mortality improvements from the 1990-1995 Basic tables demonstrating that since the introduction of the

2001 CSO Mortality Table, mortality experience has continued to improve substantially and consistently.

38.      This trend of improving mortality expectations has continued to the present day in the industry. In 2017, the SOA published a study with recommendations for mortality improvement assumptions for insurance reserving for AG-38 (Actuarial Guideline No.38), which covers reserving for certain universal life insurance policies. The SOA updates this study annually and these studies show improving mortality across the board for the last 5 years, with no negative figures in any published table from 2013-2017. These mortality improvements represent a substantial benefit that John Hancock should have passed on to Subject Policyholders, in the form of cheaper COI rates, but never did.

39.      Industry insiders also report continuing and consistent mortality improvements. For example, in 2016, Towers Watson, which insurers frequently cite to, published a report with recommendations for improvement assumptions for insurance companies. All assumptions over age 55 are positive improvements, meaning that Towers Watson expects that mortality will continue to improve at every age. Similarly, statistics published by The Human Mortality Database (HMD, organized by the Department of Demography of the University of California, Berkeley), show increases in life expectancy and lowering of mortality rates between 2010 and 2015 for older-aged individuals in the United States. And a SOA report on historical population mortality rates shows continuing mortality improvements every five years between 2000-2014.

40.      John Hancock says that it partly relies on this type of industry data in setting its mortality expectations, stating that "[m]ortality assumptions are based on our internal as well as industry past and emerging experience," and that it makes "assumptions about future mortality improvements using historical experience derived from population data." Any suggestion by

John Hancock that its mortality expectations have developed in a way that is the polar opposite of the industry is implausible. Given this consistent trend of improving mortality expectations, John Hancock should have *decreased* COI rates on the Subject Policies. But instead it raised the COI rates dramatically, allegedly on the basis of *worse* mortality expectations than those at issuance. Even if John Hancock had some decline in mortality expectation, contrary to the industry, that decline could not be close to warranting the massive increases seen here.

41.     Every year, John Hancock files responses to form interrogatories with the National Association of Insurance Commissioners ("NAIC"), which are signed by an actuary at John Hancock, concerning John Hancock's "non-guaranteed elements" (which include COI rates). One of the form interrogatories asks insurers whether "the anticipated factors underlying any nonguaranteed elements" are different from current experience, and if so, insurers must describe in general the ways in which "future experience is anticipated to differ" and "the nonguaranteed element factors that are affected by such anticipation." For each year between 2006-2015, through February 2016, John Hancock stated that, with exceptions not relevant here, "the anticipated experience factors underlying any nonguaranteed elements are not different from current experience" and that it "does continue to monitor experience." This means that as of February 2016, John Hancock admitted that its expectations of future mortality experience had not differed from its original expectations, and that no COI increases were on the horizon. There have not been adverse experience and expectations within recent years, or since February 2016, that could justify an increase in COI rates, and certainly not one of this size.  Mortality—by far the biggest driver of COI rates—has been improving industry-wide at a rate of approximately 1% per year. Even if John Hancock has for some reason not shared in this mortality improvement, its

16

mortality and lapse expectations could not have deviated so wildly in just 2 years to justify such a massive COI increase.

42.    Up until January 2017, John Hancock also repeatedly represented to owners of the Subject Policies that John Hancock's expectations of future experience had not differed from those that were used to price the initial COI rate scale, which had not changed since the policies issued. The Subject Policies promise that John Hancock will provide a report of "projected future values" for the policy "upon request," and these reports are commonly referred to in the industry as "illustrations."  John Hancock sent illustrations to named plaintiffs between at least June 2013 and February 2018, all of which gave "projected future values" for the policy *using the cheaper pre-increase COI rates*. Mortality experience has not changed for the worse since these illustrations were sent, and certainly not in a manner to justify these massive increases. Illustration standards of practice promulgated by the Society of Actuaries require that illustrations depict future values using COI rates that are "reasonably based on actual recent historical experience." Beginning in January 2017, John Hancock began informing policyholders who requested an illustration for many PUL policies that it could no longer issue illustrations because regulatory standards that govern illustration practices allegedly prevented John Hancock from "illustrating the currently payable amounts based on our current non-guaranteed elements" because "emerging experience has differed from the current assumptions which are reflected in the illustrations."  As John Hancock admitted in that correspondence sent to policyholders, John Hancock cannot illustrate current COIs if its expected future experience is worse than the "current assumptions which are reflected in the illustrations" – i.e., if its expectations of future experience are worse than the expectations that underlie the original pricing of the COI rates. Put another way, by illustrating cheaper COI rates up through the end of 2016, which depicted

"projected future values" using pre-increase cheaper COI rates, John Hancock represented that its then-current expectations were no worse than the assumptions that were used to price the policies, which are reflected in the illustrations. And yet, John Hancock continued issuing illustrations for some Subject Policies up through at least February 2018 – meaning either that John Hancock provided misleading illustrations for these policies or there was no divergence in assumptions that would warrant any increase for these policies. Because John Hancock's mortality expectations, which it claims to monitor at least annually, could not have had changed dramatically for the worse since January 2017 (or February 2018 or 2013) for the reasons above, the massive COI Increase cannot be justified by any change in those expectations.

43.     Similarly, the Subject Policies require that the COI rates "will be reviewed at least once every 5 Policy Years" or "from time to time."  The purpose of this provision – like the illustration rules and the interrogatory question discussed above – is to prevent John Hancock from engaging in a bait-and-switch tactic, where it projects cheaper COI rates in the future than its current expectations would warrant, collects premiums during that time, and then turns around many years later and reveals that COI rates will be raised because of changed expectations that, if believable, the insurer must have known about at least since the illustrations and interrogatory responses were filed. John Hancock claims that it regularly updates its mortality expectations, generating "anticipated mortality experience [that] is allocated by risk classification across all product lines." For the same reasons as above, the increase cannot be justified by any change in expectations from five years ago, or from each time it has committed to reviewing rates.

44.     John Hancock also told regulators, when filing the policy form on which many Subject Policies issued, that "[t]he cost of insurance rates will be determined at the beginning of each policy year." The purpose of this promise is also to prevent John Hancock from engaging in the bait-and-

switch tactics that it engaged in here, by springing a massive COI Increase in 2018 that could not be warranted by any recent change in its experience or expectations.

45.     Nor can John Hancock make any credible claims about how its "expectations of future mortality" provide alleged actuarial support for a COI increase. John Hancock claims that the COI increase is largely driven by "changes in our expectations of future mortality" ("EOFM"), and an enumerated factor in all Subject Policies is John Hancock's "expectations of future mortality," but John Hancock has repeatedly said in public fora that EOFM "is not a phrase John Hancock's actuaries use," is "not a very well defined concept," and "we do not use those words in the company." John Hancock has also argued, in public letters filed in federal court, that another product requiring COI rates to be based on John Hancock's "expectations of future mortality experience" "does not give any guidance at all regarding the relationship between a change in John Hancock's expectations of future mortality … and a corresponding change in the Applied Monthly Rate." Further, John Hancock has said publicly that EOFM is not "a phrase that we would use in general in the administration of a product," but is a "general phrase, whereas the expectations for a particular policy implies an accuracy that may not be there." Given these many statements, John Hancock cannot say that it suddenly now considers EOFM to provide specific actuarial justification for its new COI increase.

46.     The increased rates are also not "based on" John Hancock's "expectations of future mortality" for another reason: the post-increase COIs are extremely flat at ages 98 and above, meaning they do not increase much at all. No reasonable mortality table displays flat increases above age 98 like this. As a result, the increased rates are not plausibly based on any actual expectations of future mortality by John Hancock.

### b.  John Hancock Ignores the Enumerated Factors That Benefit John Hancock, Like Taxes

47.     While the policies (with minor variation) require that COI rates "will be based on [John Hancock's] expectations of future mortality, persistency, investment earnings, expense experience, capital and reserve requirements, and tax assumptions," John Hancock admitted to its agents that it ignored all but 2 of these factors and imposed the increase "as a result of changes in our expectations of future mortality and lapse experience" alone. But John Hancock is not permitted to ignore enumerated factors that it does not like. Most important, John Hancock ignores its favorable "tax assumptions."

48.     In the past 6 months, Manulife, which owns and reports on behalf of John Hancock and its affiliates in the United States and international companies, has been publicly touting the massive benefits of US Tax reform to its US operations.  For example, in early 2018, Manulife said that the expected "impact" of "U.S. Tax Reform" enacted in the fourth quarter of 2017 is "an expected ongoing benefit to net income attributed to shareholders and core earnings of approximately **$240 million per year commencing in 2018**."  This is on top of a series of "refinements" to John Hancock's actuarial models to "more accurately reflect the impact of tax timing differences on policy liabilities."  John Hancock told investors that "[t]hese refinements resulted in a benefit to net income of $696 million."

49.     But John Hancock simply ignored this massive expected future tax benefit, even though the policies list expectations of future "tax" assumptions as one of the factors that COI Rates "will be based on."[4]  Similarly, John Hancock recently admitted that as a result of a review of its future corporate "spread assumptions," it claimed a $344 million benefit to net income

---

[4] Manulife also reported that it took a charge for the US tax cut in 4Q 2017, but that past charge is irrelevant: COI rates can only be based on John Hancock's "*expectations* of *future*" experience and John Hancock only claims that the increase is justified by changes in its "expectation of future experience."  Further, John Hancock's expected future earnings from the tax cut will soon dwarf any past losses.

attributed to shareholders. And yet John Hancock ignored this too, even though investment earnings are listed as an enumerated factor.

50.     John Hancock cannot pick and choose to consider the enumerated factors that it claims warrant an increase and ignore those that point the other direction. But that is exactly what John Hancock did. If John Hancock had considered its future expected tax benefits, and other improvements among the enumerated factors, then a COI *decrease* would have been warranted, not an increase – and certainly not an increase of this massive size.

### c.  John Hancock Improperly Hiked COI Rates to "Increase Profitability"

51.     The COI increase was also driven by John Hancock's desire to increase profits, which is not an enumerated factor.   On an earnings call in October 2017, Manulife's CEO acknowledged that the company's North American legacy business (which includes the policies hit by this increase) was generating "less than acceptable returns." On the same earnings call, CEO Gori further said that Manulife's "top priority" is to "aggressively manage" its legacy blocks to "**increase profitability** and cash generation." This COI Increase, which was announced 6 months later, is part of Manulife's effort to "increase profitability" on the legacy block of PUL policies issued between 2003-2010. But increasing profits is not an enumerated factor on which an increase can be based under the terms of the Subject Policies.

### d.  John Hancock's Lapse Expectations Cannot Justify this Massive Increase

52.     The policy lists "persistency" as one of the enumerated factors. John Hancock claims that the increase is partly driven by a change in its expectations of future "lapse experience." But no change in lapse expectations could warrant an increase, much less one of this size, and John Hancock appears to misinterpret the "persistency" factor.

53.     John Hancock told regulators as recently as a sworn filing in February 2016 that "the anticipated experience factors underlying any nonguaranteed elements," such as its lapse expectations, "are not different from current experience." There is no downturn in lapse experience in the last 2 years that could have warranted a change in lapse expectations for the worse, and certainly not so much as to cause this massive increase. John Hancock's admission that lapse expectations did not change between product issuance and February 2016 attests to the stability of lapse rates. Industry studies also confirm that lapse rates do not vary much from year to year. For example, a 2016 industry study by A.M. Best – an entity whose ratings Manulife quotes on its website – indicated that industry lapse rates between 2006-2015 only varied between approximately 5.3%-7%, which is far less variation than would be needed to justify even a few percentage points of a COI increase.

54.     Further, the Subject Policies all issued between 2003 and 2010, so they have all been in force between 8-15 years. Any adverse lapse experience would have been detected in the early years of the policies, not in the later years. A 2012 industry study published by the Society of Actuaries – reporting on a survey of the industry including John Hancock – indicated that between 2001-2009, the industry lapse rates for universal life policies that have been in force more than 6 years are stable, varying less than approximately 2 percentage points over that span, and that the lapse rates become more stable the longer the policy has been in force. This indicates that any volatility that John Hancock may have seen in these policies would have occurred in the early years, not now, and given that John Hancock admitted in February 2016 that its lapse expectations had not changed, it is implausible that any change in lapse rates since issuance could justify a material change in COI rates. Moreover, on the November 2017 earnings call, Manulife explained that Manulife's review of lapses in 2017 only focused "on lapse in Canada

and parts of Asia," and that Manulife anticipates that it will "be reviewing lapse in the U.S. next year." Given that John Hancock did not even conduct a "deep dive" review of its lapse assumptions in 2017 for U.S. business, John Hancock could not possibly have had a recent change in lapse expectations that would justify this massive increase.

55.    John Hancock also appears to misinterpret the "persistency" factor to mean that John Hancock is permitted to raise COI rates when *less* people lapse than John Hancock expected. The 2016 A.M. Best study indicates that industry lapse rates were at 20-year lows between 2012-2015.  Similarly, John Hancock's 2016 financial statement indicated that lapse rates for its low cost universal life products were reduced, which led to a decrease in net income attributed to shareholders. While an insurer may contend that in some circumstances it should be permitted to consider the loss of income resulting from *higher* lapses, it may not use lower lapses to justify a COI increase on the theory that John Hancock had hoped to profit more from elderly insureds forgetting to pay their premiums. The policy does not permit John Hancock to punish its customers for paying their bills on time.  As John Hancock told policyholders in announcing the rate hike, if policyholders do not increase their premiums or reduce their death benefit, then their policies will lapse. This is part of John Hancock's design: it is using the increase to force policy lapses by virtue of burdensome premium increases – a tactic known as "shock lapses."

56.    And even if lapse expectations are significantly worse now than at issuance (and since recent illustrations), and John Hancock could permissibly consider that under the policy, that could still not justify this massive increase, in the face of improving mortality and tax assumptions that John Hancock ignored.

**(ii)    The COI Increase is Non-Uniform and Discriminatory**

57.     The policies require that any change in COI rates will be "on a basis that does not discriminate unfairly within any class of lives insured" or "will be made on a uniform basis for insureds of the same sex, Issue Age, and premium class, including smoker status, and whose policies have been in force the same length of time."   These uniform or non-discrimination clauses are common in the industry. At a minimum, they require that any COI increase will comply with actuarial principles, ensuring that no policyholder will be selected for an increase, or selected for an increase that is too large, for reasons that are not actuarially permissible. In its sworn interrogatory responses to regulators, John Hancock adopts the principle that "no aspect of the determination of nonguaranteed elements not covered above involves material departures from the actuarial principles and practices of the American Academy of Actuaries, applicable to the determination of nonguaranteed elements."

58.     The increase is discriminatory and non-uniform. John Hancock has (inaccurately) told its agents that it is applying increases to 1,500 of the 4,000 PUL policies that it reviewed, and, on information and belief, there are thousands more PUL policies issued between 2003-2010 that were not reviewed. John Hancock has not revealed the criteria it used to target some policies with a massive increase, and not others, but preliminary investigation reveals that there does not appear to be any actuarial justification for the choices: for example, the increase was applied to a standard male insured with issue age 73, but not to a standard male insured with issue age 65, and there is no actuarial reason to treat those two policies in such wildly disparate manners.   Similarly, John Hancock is applying wildly different increase amounts on those policies that they are picking on, and there is no actuarial justification for this disparate treatment. For example, in addition to the increases mentioned above, John Hancock has applied increases approximately of: an increase of 20% on a policy where the female insured was

standard non-smoker and 80 years old when the policy issued in 2006; an increase of 41% on a policy where the female insured was standard non-smoker and 86 years old when the policy issued in 2007; an increase of 27% on a policy where female insured was standard non-smoker and 77 years old when the policy issued in 2007; an increase of 30% on a policy where the female insured was standard non-smoker rated and 82 years old when the policy issued in 2007; an increase of 65% on a policy where the female insured was preferred non-smoker and 82 years old when the policy issued in 2008; an increase of 64% on a policy where female insured was preferred non-smoker and 80 years old when the policy issued in 2008.  These disparate rate hikes, which have no actuarial support for the wide variances, alone violate John Hancock's obligation to implement increases in a uniform and non-discriminatory manner.

59.     Further, John Hancock has not announced an increase in COI rates for any other UL policies besides the subset of policies that are subject to the increase discussed above – even though John Hancock issued other universal products between 2003-2010 (such as Majestic UL, SVULZ and Majestic VULX) which, by John Hancock's own admission, shared the same initial mortality assumptions as the PUL products hit by the increase. Had John Hancock determined COI increases "based on expectations" as to mortality and lapses, as it claims, then its COI rates would have increased for a broad range of life insurance policies, and not just PUL. That John Hancock did not implement any such broad increase confirms that the COI increases are being unlawfully used to target certain policies and policyholders in an inequitable manner and based on improper factors not provided for in the policy.

**(iii)     The COI Increase Recouped Past Losses**

60.     The contract requires that COI rates "will be based on our expectation of *future*" experience factors. This forbids COI increases that are based on a carrier's desire to increase

profits or to make up for past losses. Basic actuarial principles that are incorporated into the contract also prohibit the carrier from implementing a COI increase that would result in the carrier making more profit on the policies than it previously expected using its prior expectations. In an October 2017 earnings call, John Hancock admitted that the steps it was about to take, which included the COI Increase, were part of its effort to "aggressively manage" its legacy blocks in an attempt to "increase profits," in response to "less than acceptable returns" in the past.  That is impermissible recouping of past losses.

61.    The facts stated above, which indicate that a COI increase of this magnitude could not be supported by changes in John Hancock's *future* cost expectations, also confirm that John Hancock is increasing its profit targets on an old, closed block. In addition, the illustrations sent up through then end of 2016, and even up through February 2018, were required to use then-current mortality assumptions.  Because mortality assumptions have not materially changed since that time, the new increase massively increases John Hancock's profits on the policies, as compared to the profit margin that John Hancock was projecting in illustrations sent up through 2016, and even February 2018.

62.    In its financial statements, Manulife (reporting for John Hancock) claims to do an annual "full year review" of its actuarial assumptions, including its mortality assumptions. In the interrogatories it files with regulators, John Hancock has also told regulators that it applies its updated mortality assumptions "by risk classification across all product lines." To the extent John Hancock claims that its mortality has not been as good as it originally expected for some of these policies, John Hancock would have known about any such issue for more than a decade (and at least since the products were priced). John Hancock cannot use a COI increase now to make up for alleged losses that, if John Hancock's story is to be believed, it must have already

known about long ago. To do so would be to recoup past losses, in violation of the policy and actuarial principles.

## CLASS ACTION ALLEGATIONS

63.   This action is brought by Plaintiffs individually and on behalf of the following class—referred to herein as the "COI Increase Class"—which consists of:

> All owners of universal life insurance policies issued by John Hancock Life Insurance Company (U.S.A.), John Hancock Life Insurance Company of New York, or their predecessors, successors, or subsidiaries, or affiliates, that were subjected to the cost of insurance rate increase announced beginning in 2018 (excluding defendant John Hancock, its officers and directors, members of their immediate families, and the heirs, successors or assigns of any of the foregoing).

64.   This class consists of at least hundreds of consumers of life insurance and is thus so numerous that joinder of all members is impracticable.  The identities and addresses of class members can be readily ascertained from business records maintained by John Hancock.

65.   The claims asserted by Plaintiffs are typical of the claims asserted by the COI Increase Class.

66.   Plaintiffs will fairly and adequately protect the interests of the COI Increase Class and do not have any interests antagonistic to those of the other members of this class.

67.   Plaintiffs have retained attorneys who are knowledgeable and experienced in life insurance matters, COI increase matters, as well as class and complex litigation.

68.   Plaintiffs request that the Court afford class members with notice and the right to opt-out of any class certified in this action.

69.   This action is appropriate as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure because common questions of law and fact affecting the class predominate over those questions affecting only individual members. Those common questions include:

(a)    the construction and interpretation of the form insurance policies at issue in this litigation;

(b)    whether John Hancock's actions to increase the cost of insurance charges on certain UL policies violated the terms of those form policies;

(c)    whether Plaintiffs and Class members are entitled to receive damages as a result of the unlawful conduct by defendant alleged herein and the methodology for calculating those damages.

70.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

(a)    because of the complexity of issues involved in this action and the expense of litigating the claims, few, if any, class members could afford to seek legal redress individually for the wrongs that defendant committed against them, and absent class members have no substantial interest in individually controlling the prosecution of individual actions;

(b)    when defendant's liability has been adjudicated, claims of all class members can be determined by the Court;

(c)    this action will cause an orderly and expeditious administration of the class claims and foster economies of time, effort and expense, and ensure uniformity of decisions;

(d)    without a class action, many class members would continue to suffer injury, and defendant's violations of law will continue without redress while defendant continues to reap and retain the substantial proceeds of its wrongful conduct; and

(e)      this action does not present any undue difficulties that would impede its management by the Court as a class action.

## FIRST CLAIM FOR RELIEF

### Breach of Contract against John Hancock (on behalf of Plaintiffs, and the COI Increase Class)

71.     Plaintiffs reallege and incorporate all allegations of this complaint as if fully set forth herein.

72.     The subject policies are binding and enforceable contracts.

73.     The 2018 COI rate increases and conduct by Defendants that preceded it have materially breached the policies in several respects, including but not limited to failing to provide an illustration upon request and the following:

(a)      The COI rate hike breached the policies by not determining COI rates based on the factors enumerated in the policies;

(b)      The COI rate hike breached the policies by not basing the adjustments on expectations of John Hancock's future experience;

(c)      The COI rate hike breached the policies by imposing non-uniform and unfairly discriminatory rate hikes on insureds; and

(d)      The COI rate hike breached the policies by recouping past losses.

74.     In the event that any breach alleged herein is not explicitly covered by the terms of the contract, John Hancock has breached the covenant of good faith and fair dealing by the conduct alleged above.

75.     Plaintiffs have performed all of its obligations under the policies, except to the extent that its obligations have been excused by John Hancock's conduct as set forth herein.

76.     As a direct and proximate cause of John Hancock's material breaches of the policies, Plaintiffs have been—and will continue to be—damaged as alleged herein in an amount to be proven at trial and are entitled to an injunction to prevent John Hancock from failing to comply with its contractual promise to provide an illustration "upon request" to the COI Increase Class.

## SECOND CLAIM FOR RELIEF

### Violation of New York Insurance Law, Section 4226 (against JHNY on behalf of Plaintiff PBR Partners and the New York Sub-Class)

77.     Plaintiffs reallege and incorporate all allegations of this complaint as if fully set forth herein. This claim is brought on behalf of the Plaintiff PBR Partners and the New York Sub-Class. The New York Sub-Class consists of all members of the COI Increase Class, where the policy was issued by JHNY or its predecessors, or was acquired by JHNY.

78.     New York Insurance Law Section 4226(a) imposes liability on any insurer that issues or circulates any illustration, circular, statement, or memorandum misrepresenting the terms, benefits, or advantages of any of its insurance policies, and also imposes liability on any insurer that makes any misleading representation, or any misrepresentation of the financial condition of any such insurer. N.Y. Ins. Law § 4226(a)(1) & (4).

79.     If John Hancock's story is to be believed – and John Hancock's mortality expectations substantially decreased while industry mortality expectations substantially improved – then John Hancock applied unreasonably extreme and aggressive haircuts to the mortality tables when setting original pricing of the Subject Policies, and these pricing assumptions were designed to make John Hancock's product look substantially cheaper in the future than competitors' and gain market share. In this way, if John Hancock's story is to be believed, John Hancock engaged in a bait-and-switch, projecting unreasonably low future COI

rates at initial pricing and in its illustrations up through 2016 (and through February 2018), and then raised those rates after collecting hundreds of millions in premiums. If John Hancock's story were to be believed, then John Hancock would have known at policy issuance, and in recent years, that its future mortality expectations were too optimistic, and yet it continued to "project" future cheaper COI rates than its actual expectations permitted.

80.   If John Hancock's justification of the COI increase is to be believed, then the illustrations provided to plaintiffs, and owners of the Subject Policies, depicted performance more favorable to the policy holder than would have been possible using a scale that was reasonably based on their recent experience, and depicted COI rates to Plaintiff that were not based on "reasonable actual recent historical experience."

81.   After policy issuance, John Hancock prepared and circulated false and misleading illustrations to Plaintiffs (and their predecessors in interest) at least on or about the following dates: June 2013 and February 2018 for the Jacobs policy; February 2014 for the Poplawski policy.  Each of these illustrations included a table that projected policy values for a given set of premium payments that were more favorable to the policyholder than reasonable recent mortality experience, if John Hancock's story is to be believed.  Each of these illustrations misrepresented the benefits and advantages of the policies by projecting future COI rates using mortality and other assumptions that John Hancock knew were unreasonable, if its story is to be believed.

82.   These material misrepresentations are significant, and injured Plaintiffs (including their predecessors-in-interest). Had John Hancock complied with New York Insurance Law § 4226, policyholders, including the Plaintiffs, would have been given far more advanced warning of the COI rate increases, so that policy owners, such as the Plaintiff and its predecessor-in-interest, would not have bought the policy at all or, if purchased after issuance, the purchaser

would have paid much less for the policy, and could have stopped paying premiums earlier. John Hancock's misleading illustrations induced Plaintiff to continue to pay regular premiums to John Hancock.

83.    JHNY knowingly violated N.Y. Ins. Law § 4226(a) and (d) and/or knowingly received premiums and other compensation in consequence of such violation.

84.    Plaintiff PBR Partners and members of the New York Sub-Class have paid premiums for life insurance policies sold by an insurer authorized by the State of New York that nonetheless failed to comply with New York law governing representations made by such an authorized insurer. Plaintiff PBR Partners and members of the New York Sub-Class are therefore persons aggrieved under the statute as a result of JHNY's misrepresentations.

## THIRD CLAIM FOR RELIEF

### Violations of California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 et seq. (against JHUSA on behalf of Paplowski Plaintiffs and the California Sub-Class)

85.    Plaintiffs reallege and incorporate all allegations of this complaint as if fully set forth herein. This claim is brought on behalf of the Poplawski Plaintiffs and the California Sub-Class. The California Sub-Class consists of all members of the COI Increase Class, where the policy was issued for delivery in California.

86.    JHUSA committed acts of unfair competition in violation of California Business and Professional Code §§ 17200 et seq.

87.    Under the language of the policies, JHUSA offered flexible premiums that would allow policyholders to fund only enough premiums to cover the monthly deductions, that JHUSA would not raise the COI Rate and consequent monthly deduction except based on certain anticipated future expense factors stated in the policies and would not raise the cost of insurance

in order to recoup past losses.  JHUSA made those representations in the Policies, on its website, its marketing materials and press releases.

88.    JHUSA has willfully violated Section 17200 et seq. by increasing COI Rates in order to recoup past losses despite assurances and representations that it would not do so, and doing so as part of an unfair and deceptive scheme designed to force policy lapses by virtue of burdensome premium increases – a tactic known as "shock lapses."

89.    The aforementioned conduct is likely to mislead and has misled reasonable consumers acting reasonably under the circumstances.  For example, reasonable consumers expect that when they purchase flexible-premium universal life insurance, they need only pay the minimum premiums required to cover the COI charges and standard expense charges, and that COI rates will not be raised unless there has been a reasonable change in John Hancock's expectations of the enumerated factors, and that COI rates will not be raised to increase profits and shock lapse those policies that John Hancock believes it is more profitable for it to shock lapse. No reasonable consumer would expect that Defendants would increase rates in the face of improving mortality, force them to increase their policy values upon threat of massive COI increases, or otherwise force them to let their policies lapse in the face of such premium adjustments.

90.    JHUSA's conduct is consumer-oriented and of a recurring nature.  JHUSA marketed and sold policies to the public at large in California pursuant to form insurance policies that are contracts of adhesion.  At least hundreds of such policies have been sold and a substantial number of the policyholders have been affected.

91.     As a direct proximate cause of violation of Section 17200 et seq., the Poplawski Plaintiffs and members of the California Sub-Class have been damaged as alleged herein in an amount to be proven at trial.

92.     The Poplawski Plaintiffs, on behalf of themselves and members of the California Sub-Class, seek monetary damages and injunctive relief, including allowing reinstatement of policies that have lapsed or been surrendered following JHUSA's breach of contract, as well as costs and reasonable attorneys' fees.

**FOURTH CLAIM FOR RELIEF**

**Violations of California Elder Abuse Statute, Cal. Welf. & Inst. Code §§ 15610 _et seq._**
**(against JHUSA on behalf of the Poplawski Plaintiffs and the California Elder Sub-Class)**

93.     Plaintiffs reallege and incorporate all allegations of this complaint as if fully set forth herein. This claim is brought on behalf of the Poplawski Plaintiffs and the California Elder Sub-Class. The California Elder Sub-Class consists of all members of the COI Increase Class for which the insureds were age 65 or older when the policy was issued and were residents of California.

94.     This cause of action is brought under California's Welfare and Institutions Code section 15610, et seq.

95.     By imposing the COI Increase, JHUSA took, depleted, appropriated and/or retained the Poplawski Plaintiffs' and the California Sub-Class members' personal property in bad faith for a wrongful use and/or with the intent to defraud, which constitutes financial abuse as defined in California Welfare & Institutions Code section 15610.30.

96.     The insured, Ms. Poplawski, has used some of her own income to pay premiums on the policy. The COI increase made the voluntary transfer of Ms. Poplawski's assets much

more expensive and of lesser value, and so her right to dispose of her property has been damaged.

97.    JHUSA is guilty of oppression, fraud, and malice in the commission of the above-described acts of abuse. At a minimum, JHUSA knew or should have known that its conduct was likely to be harmful to elders.

98.    Under California Civil Code section 3294, JHUSA is liable to the Poplawski Plaintiffs and the California Elder Sub-Class members for punitive damages.

99.    Under California Welfare & Institutions Code section 15657.5 Defendants are liable to the Poplawski Plaintiffs and the California Sub-Class members aged 65 years or older for reasonable attorney fees and costs

## **PRAYER FOR RELIEF**

WHEREFOR, Plaintiffs pray for judgment as follows:

1.    Declaring this action to be a class action properly maintained pursuant to Rule 23(b)(3) and Rule 23(b)(2) of the Federal Rules of Civil Procedure;

2.    Awarding Plaintiffs and the Classes (including Sub-Classes) compensatory damages, restitution, disgorgement, penalties, and any other relief permitted by law or equity pursuant to the First through Fourth Claims for Relief;

3.    Awarding Plaintiffs and the Classes (including Sub-Classes) pre-judgment and post-judgment interest pursuant to their First through Fourth Claims for Relief, as well as costs and fees;

4.    Awarding Plaintiffs and the COI Increase Class, the New York Sub-Class, and the California Sub-Class injunctive relief, preliminarily and permanently enjoining JHNY and JHUSA from:

(a)    continuing to engage in the unlawful and unfair conduct;

(b)    preventing Defendants from collecting the unlawfully and unfairly increased COI amounts in violation of the Policies and preventing Defendants from refusing to illustrate "upon request"; and

(c)    ordering the reinstatement of any policy that was surrendered or terminated following Defendants' breach and unlawful conduct, as well as attorneys' fees and costs.

5.    Awarding Plaintiffs and each of the Classes (including Sub-Classes) such other relief as set forth above and this Court may deem just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury as to all issues so triable.

Dated: June 5, 2018

 _/s/Seth Ard_____
Seth Ard (SA-1817)
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY  10019
Tel.:    212-336-8330
Fax:    212-336-8340
sard@susmangodfrey.com

Steven Sklaver (pro hac vice to be filed)
Glenn Bridgman (pro hac vice to be filed)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel:    310-789-3100
Fax:    310-789-3150
ssklaver@susmangodfrey.com
gbridgman@susmangodfrey.com

*Attorneys for Plaintiffs*