**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| JEFFREY LEONARD, IN HIS CAPACITY AS TRUSTEE OF THE POPLAWSKI 2008 INSURANCE TRUST; PHYLLIS POPLAWSKI; PBR PARTNERS; BRIGHTON TRUSTEES, LLC, on behalf of and as trustee for COOK STREET MASTER TRUST III; BANK OF UTAH, solely as securities intermediary for COOK STREET MASTER TRUST III; TRINITY 2015 LS FUND, LLC; PEAK TRUST COMPANY, AK, on behalf of and as trustee for SUSAN L. CICIORA TRUST and STEWART WEST INDIES TRUST; and ADVANCE TRUST & LIFE ESCROW SERVICES, LTA, as securities intermediary for LIFE PARTNERS POSITION HOLDER TRUST, on behalf of themselves and all others similarly situated | Civil Action No. 18-cv-04994-AKH<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs,

vs.

JOHN HANCOCK LIFE INSURANCE
COMPANY OF NEW YORK and JOHN
HANCOCK LIFE INSURANCE COMPANY
(U.S.A.)

Defendants.

Pursuant to ¶ B(2)-(3) of the Court's January 10, 2020 Order (Dkt. 104), Plaintiffs, on behalf of themselves and all others similarly situated, for their First Amended Complaint against defendants John Hancock Life Insurance Company of New York ("JHNY") and John Hancock Life Insurance Company (U.S.A.) ("JHUSA" and, together with JHNY, "John Hancock," or "Defendants"), state as follows:

## NATURE OF THE ACTION

1.     This is a class action brought on behalf of Plaintiffs and similarly situated owners of life insurance policies issued by John Hancock and its predecessors ("John Hancock policies").

Plaintiffs seek to represent a class of John Hancock policyholders who have been subjected to an unlawful and excessive cost of insurance ("COI") increase by John Hancock in violation of their insurance policies.

2.      The policies at issue ("Subject Policies") are all Performance Universal Life insurance policies ("PUL policies") issued between 2003 and 2010. The principal benefit of universal life policies generally and the PUL policies specifically is that, unlike other kinds of whole life insurance that require fixed monthly premium payments, the premiums required for universal life policies are flexible and need only be sufficient to cover the COI charges and certain other specified expenses. The COI charge is typically the highest charge that a policyholder pays. As a result, the provision in the policy explaining how and when COI charges can be adjusted is one of the most important terms of the contract. Here, the policies state either that:

> The charge for the Net Amount at Risk … **will be based on our expectations of future mortality, persistency, investment earnings, expense experience, capital and reserve requirements, and tax assumptions**. We review our cost of insurance rates **from time to time**,[1] and may redetermine Cost of Insurance rates **at that time on** a basis that **does not discriminate unfairly within any class of lives insured**.

Or:

> The applied monthly rates **will be based on our expectations of future investment earnings, persistency, mortality, expense and reinsurance costs and future tax, reserve, and capital requirements**…. They will be reviewed **at least once every 5 policy years**. Any change in applied monthly rates will be made **on a uniform basis** for insureds of the same sex, issue age, and premium class, including smoker status, and whose policies have been inforce for the same length of time**.**

3.      In February 2018, John Hancock's parent company, Manulife Financial Corporation (which reports on behalf of John Hancock in consolidated statements), announced that it had a $1.6 billion net loss in the fourth quarter of 2017. At the same time, Manulife also

---

[1] One policy form uses the term "periodically" in lieu of "time to time."

reported that its 2017 net income attributed to shareholders decreased by $825 million, as compared to 2016. In February 2018, the press reported that Manulife has been trying to sell "parts of its life insurance operations" in the United States, which "it regards as unattractive from a returns prospective." And in November 2017, on an earnings call, Manulife's CEO acknowledged that the company's North American legacy business (which on information and belief includes the policies hit by this increase) is "generating returns that are less than acceptable." On this November 2017 earnings call, Manulife's CEO Roy Gori further said that Manulife's "number one" priority is to "aggressively manage" its legacy blocks to **increase profitability** and cash generation," and that "shareholder returns" will be a big part of how Manulife measures "progress in our legacy business."

4.      In May 2018, John Hancock sent a cryptic letter to policyholders notifying them of a massive increase in COI rates and charges on certain "John Hancock Performance Universal (UL) Life insurance policies." The amount of the COI rate increase and the actuarial justifications for it were not disclosed. John Hancock disclosed only that it had "completed a review" of these policies, and "[a]s a result of this review, our expectation of future experience has changed, and therefore the Cost of Insurance rates on your Performance UL policy will be increasing." John Hancock's filings with state regulators reveal that a major driver of the increase was to meet its "various profit objectives."

5.      Subsequent disclosures and investigation reveals that John Hancock told its agents (but not policyholders) in May 2018 that "since January 2017," John Hancock has "been unable to provide inforce illustrations on about 4,000 Performance UL policies issued between 2003 and 2010," and after "a review of emerging experience," decided to increase COI rates on "a subset of those policies," resulting in a rate hike on "approximately 1,500 policies." John Hancock did not

disclose why it chose to select those 4,000 policies for review, nor why it chose to increase rates on only 1,500 of them. John Hancock disclosed to its agents only that "as a result of changes in our expectations of future mortality and lapse experience, we will be increasing the Cost of Insurance rates on a subset of these policies," and "the amount of the increase will vary by policy." And contrary to what John Hancock told its agents, the increase was imposed on some policies for which John Hancock continued to provide inforce illustrations well past January 2017.

6.     When announcing the massive COI rate increase, and the suspension of illustrations, John Hancock did not disclose that, when reviewing the proposed COI increase, the New York Department of Financial Services ("NYDFS") concluded that the assumptions John Hancock had originally used when pricing the policies were not reasonable. Specifically, the NYDFS explained:

After reviewing John Hancock's mortality and lapse studies used to price the various generations of the subject UL products and the studies underlying the proposed COI increase, we have concluded that the original pricing assumptions were aggressive and not reasonable and therefore were in violation of section 4232(b)(2) of the Insurance Law. Use of reasonable assumptions would have shown much greater future expected losses for the company at time of sale, in line with what is now expected by the company. Therefore, we object to the proposed COI increase based on section 4232 and article 24 of the Insurance Law.

7.     John Hancock continued through 2018 to send illustrations to policy holders using those assumptions without disclosing that they were aggressive and unreasonable.

8.     Internally, however, John Hancock had long recognized that its original pricing assumptions were no longer valid. By 2011, in fact, John Hancock had adopted new mortality tables and lapse assumptions that required it to write down the value of the Performance UL block by $404 million. Notwithstanding its contractual obligation to review COI rates periodically, and in no event less than every five years, and John Hancock's representations that it had reviewed its

4

non-guaranteed elements continuously during this period, John Hancock nevertheless elected (a) not to change COI rates and (b) to continue illustrating policy values using then-current COI rates. In a remarkable about-face, however, John Hancock now seeks to recoup these past losses that it recognized long ago, in breach of policies.

9.     Notably, John Hancock told regulators as recently as February 2016 that its expectations did not warrant any change in projected COI rates. Moreover, John Hancock regularly sends policyholders a report on the "projected future values" for their policy, and the policies promise that policyholders will receive these reports "upon request." Prior to the COI increase, named plaintiffs received these reports (called illustrations) from John Hancock at least as recently as February 2018, in which John Hancock "projected" that the *old, cheaper* COI rates would continue for the life of the policy. And then, John Hancock suddenly raised rates in May 2018. But nothing has changed in that short period of time to justify this massive COI increase. Mortality— by far the biggest driver of COI rates—has been improving industry-wide at a rate of approximately 1% per year. And lapse rates are relatively stable industry-wide, especially for policies, like all Subject Policies, that have been in force for at least 8 years.

10.     The COI increase is massive. For example, in the case of one plaintiff, Ms. Poplawski, the insured took out a policy on her own life in 2008. After paying 10 years of premiums at John Hancock's "projected" rates, John Hancock suddenly increased her COI rates by approximately 70% per year, causing her trust to have to pay approximately $225,000 more in premiums *per year* to keep her insurance coverage. She is now 87 years old, at an age when finding suitable replacement insurance is prohibitively expensive, if it is available at all.

11.     Other policyholders have seen increases ranging from 17% to 75%. John Hancock did not provide any reason to policyholders for the wildly disparate COI increases, and nothing

possibly could have changed in recent years to justify such an increase. Indeed, mortality expectations have continued to improve, which should have led to a decrease in rates.

12.     The COI Increase violated the terms of the policies in numerous respects. ***First***, John Hancock used unenumerated and unpermitted factors to justify the increase, while simultaneously ignoring enumerated factors that would have led to *lower* COI rates. For example, John Hancock had entered into reinsurance treaties whereby reinsurers would have the right to increase reinsurance rates proportionally if John Hancock raised COI rates. This created a compounding effect: the more John Hancock increased COI rates, the more the reinsurer would raise reinsurance rates. John Hancock relied on this increased cost of reinsurance to justify raising COI rates even further, even for policies that did not permit reinsurance costs to be considered at all. John Hancock also admits that the increase was driven by John Hancock's desire to "increase profitability," but increased profitability—or even meeting its profit objectives—is not one of the enumerated factors that a COI rate increase can be "based on" under the explicit terms of the Subject Policies. At the same time, and as another example, John Hancock ignored the 2017 U.S. tax cuts that it announced would save it $240 million per year going forward (despite "tax assumptions" being a factor on which COI rates "will be based") and also ignored favorable investment spreads (despite "investment earnings" being a factor on which COI rates "will be based").

13.     ***Second***, both the current and baseline assumptions were manipulated in order to boost profitability. The assumptions on which John Hancock relied to justify the COI increase were thus not John Hancock's "expectations," nor were they reasonable, in violation of New York Insurance Law Section 4232(b)(2). Indeed, John Hancock intentionally deferred the COI increase

for a year in order to concoct so-called assumptions that would allow them to reap greater profits even *after* accounting for the cost of delay.

14.     ***Third,*** the Subject Policies require that the COI rates "will be reviewed at least once every 5 Policy Years" or "from time to time," with any change in rates being made at that time. The purpose of this provision—like the regulatory statement and the illustration provision discussed above—is to prevent the insurer from engaging in a bait-and-switch tactic, where it projects low COI rates in the future, collects premiums, and then turns around many years later and increases COI rates allegedly due to changes in expectations that happened long ago. Accordingly, John Hancock was obligated to review COI rates periodically and to make any changes it intended to make at the time it reviewed the rates. It also means that any change in rates must be based on recent changes to expectations that occurred since the last review of non-guaranteed elements—not historical changes that pre-dated prior reviews. But rather than basing the COI Increase on changes since June 2013 (five years prior to the increase), or its last redetermination of non-guaranteed elements, John Hancock went back in time and used a modified version of its ***original*** pricing assumptions as its baseline. By doing this, John Hancock breached the periodic review provisions and recouped losses that it had recognized long ago, including the $404 million write down that it recognized in 2011.

15.     In addition to violating the terms of the policies and actuarial standards, John Hancock's methodology is wholly inconsistent with both its representations as late as 2016 that "anticipated experience factors underlying any nonguaranteed elements" were not "different from current experience" and the fact that John Hancock continued illustrating the lower, original COI rates through 2017 (thereby representing that its "recent historical experience" was the basis for those COI rates). It is also inconsistent with Manulife's April 2015 certifications to Canada's

Office of the Superintendent of Financial Institutions ("OSFI") that ██████████

████████████████████████████████████████████████████████████

██████████████████████████████████████ and its December 2015 certification that

████████████████████████████████████████████████████████████

████████████████████████████████ These regulatory certifications mean that any

increase in COI rates must have been based on changes from 2016 forward. But John Hancock's

unlawful methodology instead seeks to recoup losses it claims to have experienced long before

2016.

16.     *Fourth*, the increase breached the non-discrimination and uniformity provisions in

multiple respects:

(a) John Hancock is applying increases to some PUL policies and not others, including the

    wholesale exemption of Performance UL 2010 from any increase;

(b) John Hancock is applying wildly different increase amounts even among those policies

    John Hancock has decided to target, and even within the same policy classes;

(c) John Hancock is punishing policyholders for its own sales practices, including its extensive

    use of table-shaving;[2]

(d) Because John Hancock's administrative system was unable to process all increases at the

    same time, some unfortunate policy holders were subjected to an increase in July 2018,

    while others did not receive the increase until July 2019;

(e) After implementing the COI Increase on hundreds of policyholders, John Hancock

    arbitrarily targeted certain putative class members for potential settlement of their claims

_____

[2] Table-shaving is a practice whereby an insurer ignores its own underwriting standards and assigns a policy to an upgraded premium class (e.g., rating a substandard as a standard, or a standard as a preferred). This has the effect of distorting the experience of a premium class.

related to this lawsuit, further discriminating against certain policyholders on a non-uniform basis.

Each of these actions violated John Hancock's contractual obligation to not discriminate within any class of lives insured. This conduct also violated the requirement under New York Insurance Law Section 4232(b)(4) that COI rates be determined "on a basis equitable to all policyholders of a given class."

17.     Tellingly, John Hancock did **not** implement the COI Increase on other products that John Hancock issued between 2003 and 2010, despite the fact that John Hancock tells regulators that its mortality experience is "allocated across product lines." It also did not implement any COI increase on Performance UL 10 policies, despite the fact that it was priced using the same mortality table (JH07) as Performance UL 08, Performance UL 09, and Performance UL 09r.

18.     This is because the true reason for the increase is not changes in mortality or lapse experience, as John Hancock claims, but rather because John Hancock deliberately priced the policies to be unprofitable in later years and now wants to induce lapses and recoup past losses and increase rates in violation of the policies.

19.     Making matters worse, in violation of the policy provision that promises illustrations "upon request," John Hancock refused to provide accurate illustrations for Subject Policies beginning in January 2017 and through May 2018, which would have helped the insureds make investment and estate planning decisions earlier.

20.     The COI rate hike and John Hancock's actions preceding it therefore breached the John Hancock policies in at least five respects:

        a.      Increases were not properly based upon the enumerated factors specified in
                the policies' COI provisions or on changes occurring since the most recent review;

b.      Increases were non-uniform and discriminatory;

c.      Increases were designed to recoup past losses occurring prior to earlier COI rate reviews rather than respond to any new changes in expectations;

d.      Illustrations provided to the plaintiffs were not reasonable and not based on John Hancock's expectations of future mortality, persistency, investment earnings, expense experience, capital and reserve requirements, or tax assumptions, and therefore were not a valid projection of future values; and

e.      John Hancock failed to provide illustrations upon request.

## THE PARTIES

21.      Plaintiff Jeffrey Leonard, in his capacity as Trustee of The Poplawski 2008 Insurance Trust (a "Poplawski Plaintiff" of the "Poplawski Trust"), is a trustee of the Poplawski Trust, which holds in trust a John Hancock PUL policy insuring the life of plaintiff Phyllis Poplawski (together with the trustee, the "Poplawski Plaintiffs"), with the policy number 93735017 (the "Poplawski Policy"). On February 21, 2008, John Hancock issued the Poplawski Policy with a face amount of $10,000,000, insuring the life of Phyllis Poplawski, age 76 at the time of issue, and designating the Poplawski Trust, Jeffrey Leonard, as the owner. The policy was issued in the state of California. In May 2018, after paying 10 years of premiums, and at the age of 86, Ms. Poplawski and the trustee received notice stating that her COI rate was increasing, which would cause her to lose her existing insurance coverage unless she raised her premiums substantially. Ms. Poplawski was 86 years old at the time of COI increase, and a resident of California throughout all relevant times since policy issuance. Along with the notification of the increase, the Poplawski Plaintiffs received an illustration showing the projected performance of

the policy under non-guaranteed and guaranteed assumptions. The illustration demonstrates that the COI increase will have an enormous financial impact.

22.     Plaintiff PBR Partners is a New York general partnership, with a principal business address at 176 East 71st St., Apt. 2B, New York, NY, 10021. PBR is the owner of a PUL insurance policy hit by the COI Increase on an insured with the surname Jacobs ("Jacobs policy"), who was 73 years old when the policy issued in 2006. The Jacobs policy was issued and delivered in New York by JHNY and has a face amount of $10,000,000. The Jacobs policy has had its rates increased by 17%.

23.     Plaintiff Brighton Trustees, LLC, which brings this action on behalf of and as trustee for Cook Street Master Trust III, is a Delaware limited liability company with its principal place of business in New York. The sole members of Brighton Trustees, LLC are individuals who are United States citizens domiciled in New York and Canada.

24.     Cook Street Master Trust III is a New York common law trust. Cook Street Master Trust III is the beneficial owner and entitlement holder of policy number 93060663 which was issued on June 14, 2007, in the State of Florida, and policy number 93695682, which was issued on December 7, 2007 in the State of New Jersey. Bank of Utah holds both policies as securities intermediary for Cook Street Master Trust III.

25.     Bank of Utah is a Utah corporation with its principal place of business in Utah. Bank of Utah is securities intermediary to Cook Street Master Trust III. Bank of Utah maintains securities accounts for Cook Street Master Trust III as securities intermediary pursuant to written agreements—specifically, an April 8, 2018 Securities Account Control Agreement between Bank of Utah and Cook Street Master Trust III. Under the foregoing agreements, each policy constitutes a "Subject Life Contingent Asset" that Bank of Utah, as securities intermediary, has credited to

the "Client Securities Account." Cook Street Master Trust III is the "beneficial owner" and "entitlement holder" under their respective agreements with Bank of Utah, and, accordingly, is entitled to exercise the rights that comprise each financial asset in the Client Securities Account. Bank of Utah, as securities intermediary for Cook Street Master Trust III, is identified as the owner and beneficiary of the policies on John Hancock's records.[3]

26.     Plaintiff Trinity 2015 LS Fund, LLC ("Trinity") is a Texas limited liability company. Trinity is the owner of a PUL insurance policy hit by the COI Increase on an insured with policy number 93765071. The Trinity policy was issued and delivered in New York by JHNY and has a face amount of $20,000,000. As a result of the COI Increase, the Trinity policy has had its rates increased by 44%.

27.     Plaintiff Peak Trust Company, AK ("Peak Trust") is an Alaska chartered trust company. Peak Trust is a trustee for the Susan L. Ciciora Trust and the Stewart West Indies Trust, and holds in trust the following PUL policies that were hit by the COI increase: policy number 93793750 (face amount $20,000,000); policy number 93560746 (face amount $20,000,000); and policy number 93793768 (face amount $14,000,000). These three policies were issued for delivery in Arizona. Peak Trust has held these policies in trust since their issuance in 2007. As a result of the COI increase, the rates on these policies are being increased by 39%.

28.     Plaintiff Advance Trust & Life Escrow Services, LTA ("ATLES") is organized under the laws of Texas. Plaintiff is suing in its capacity as securities intermediary for Life Partners Position Holder Trust and is the owner of 39 life insurance policies subjected to the COI increase

---

[3] At all times relevant to this case, Bank of Utah, has acted, and continues to act, solely in its capacity as a securities intermediary for the relevant entity or entities provided herein and not in its individual capacity. The Uniform Commercial Code defines a securities intermediary as "(i) a clearing corporation; or (ii) a person, including a bank or broker, that in the ordinary course of its business maintains securities accounts for others and is acting in that capacity." U.C.C. § 8-102(a)(14).

imposed by JHNY and JHUSA. The policies were issued in Arizona, California, Colorado, Delaware, Florida, Illinois, Minnesota, North Carolina, New Jersey, New York, Pennsylvania, Texas, and Virginia.

29.     John Hancock Life Insurance Company of New York ("JHNY") is a corporation organized under the laws of New York and has its principal place of business in Valhalla, New York. On January 1, 2010, approximately $7.3 billion of life insurance, fixed annuity, and variable annuity reserves and liabilities related to policyholders who resided in New York, including the assets supporting the business, were transferred from JHUSA to JHNY. JHNY, or its predecessors, issued and holds many of the policies hit by the COI Increase.

30.     John Hancock Life Insurance Company (U.S.A.) ("JHUSA") is a stock life insurance company organized under the laws of the state of Michigan, with its principal offices in Boston, Massachusetts. JHNY is a wholly owned subsidiary of JHUSA, a Michigan life insurance company. The ultimate parent of JHUSA and JHNY is Manulife Financial Corporation ("Manulife"), a Canadian-based insurance and financial services holding company. JHUSA, or its predecessors, issued and holds many of the policies hit by the COI Increase.

## JURISDICTION AND VENUE

31.     This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1332(d) because this is a class action with diversity between at least one class member and one defendant and the aggregate amount of damages exceeds $5,000,000. JHNY is incorporated and has its principal office in New York; JHUSA is incorporated in Michigan and has principal office in Massachusetts. Plaintiffs are citizens of several states, as set forth above, and unnamed class members are citizens of states across the United States. This action therefore falls within the

original jurisdiction of the federal courts pursuant to the Class Action Fairness Act, 28 U.S.C §
1332(d).

32. This Court has personal jurisdiction over John Hancock because JHNY is a citizen
and resident of this state, and the decision to raise COI rates was made jointly by JHNY and
JHUSA and announced jointly by both companies in a uniform letter. The uniform letters to
policyholders announcing the COI increase state that the "Insurance products are issued by" JHNY
in New York and JHUSA, and refers to both entities "collectively … as John Hancock." The notice
of the COI increase for the Jacobs policy was sent by John Hancock to PBR Partners' business
address in Manhattan.

33. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)–(c)
because the events giving rise to Plaintiffs' causes of action occurred in this District, including the
COI overcharge, which was imposed on PBR Partners in Manhattan.

## FACTUAL BACKGROUND

### A.   The Policies at Issue

34. The policies at issue are UL policies issued by John Hancock between 2003 and
2010. These policies are all flexible-premium, universal life policies, and there are no fixed or
minimum premium payments required by the policies. The principal benefit of UL policies is that
they permit policyholders to pay the minimum amount of premiums necessary to keep the policies
in force. Unlike other kinds of whole life insurance that require fixed monthly premium payments,
the premiums required for UL policies need only be sufficient to cover the COI charges and certain
other specified expenses. The COI charge is typically the highest expense that a policyholder pays.
The COI charge is deducted from the policy account (i.e., the savings component) of the policy on
a monthly basis, so the policyholder pays the COI charge entirely to John Hancock. Any premiums

paid in excess of COI charges and expense components are applied to a policy's policy account, sometimes known as "account value" or "cash value." These excess premiums earn interest. This structure is beneficial because it allows policyholders to minimize their capital investment and generate greater rates of return through other investments. Depending on the interest rate environment and the credited rate, other policyholders may choose to heavily fund their policies and use the interest to pay COI charges and grow the account value.

35.     The size of the COI charge is highly significant to Plaintiffs and all UL policyholders for at least two important reasons. First, it dictates the minimum amount of money they must pay to keep a policy in force. Second, high COI rates can quickly diminish a policy's account value and reduce the amount of money on which they can earn interest. Absent a secondary guarantee, if a policy account value diminishes such that COI charges can no longer be deducted, and the appropriate time expires after John Hancock provides an accurate and adequate grace notice, then a policy will lapse unless additional premiums are paid in.

36.     Each of the Subject Policies has specific language regarding how the COI rates will be determined. One set of policies provides:

> The Applied Monthly Rates are the actual rates used to calculate the Cost of Insurance Charge. We will determine the Applied Monthly Rates to be used for this policy. The Applied Monthly Rates **will be based on our expectations of future investment earnings, persistency, mortality, expense and reinsurance costs and future tax, reserve and capital requirements** and … will never be greater than the Maximum Monthly Rates shown in Section 2 divided by 1,000…. **They will be reviewed at least once every 5 Policy Years. Any change in Applied Monthly Rates … will be made on a uniform basis for insureds of the same sex, Issue Age, and premium class, including smoker status, and whose policies have been in force the same length of time**.[4]

A second set of policies provides:

> The Cost of Insurance Charge for a specific Policy Month is the charge for the Net Amount of Risk, including any Additional Ratings and any Supplementary Benefit

---

[4] All emphases added unless stated otherwise.

riders which are part of the policy. The charge for the Net Amount at Risk is an amount equal to the per dollar cost of insurance rate for that month multiplied by the Net Amount at Risk, and **will be based on our expectations of future mortality, persistency, investment earnings, expense experience, capital and reserve requirements, and tax assumptions**. The Maximum Monthly Rates at any age are shown in Section 2 as a rate per \$1,000 of Net Amount at Risk. To get the maximum rate per dollar, the rate shown must be divided by 1,000. Each Cost of Insurance Charge is deducted in advance of the applicable insurance coverage for which we are at risk… **We review our Cost of Insurance rates from time to time,[5] and may re-determine Cost of Insurance rates at that time on a basis that does not discriminate unfairly within any class of lives insured**.

37.     On information and belief, all polices hit by the COI increase contain materially the same terms as above. The policies at issue are all form policies, and insureds are not permitted to negotiate different terms. They are all contracts of adhesion.

**B.**     **John Hancock's Unlawful COI Increase**

38.     In May 2018, John Hancock sent a cryptic, uniform letter to policyholders notifying them of a massive increase in COI rates on certain "John Hancock Performance Universal (UL) Life insurance policies." The amount of the new COI rate increase and the actuarial justifications for it were not disclosed. John Hancock disclosed to policyholders only that it had "completed a review John Hancock Performance Universal (UL) Life insurance policies," and that "[a]s a result of this review, our expectation of future experience has changed, and therefore the Cost of Insurance rates on your Performance UL policy will be increasing." In the letter, John Hancock refers to the COI increase as a "premium increase." The letter warns that if the policyholder does not increase its premiums or reduce the death benefit, the "policy will not remain inforce as originally projected."

39.     John Hancock gave slightly more information to its agents than to its policyholders, explaining to its agents:

---

[5] The policy form for one product version—Performance UL 09—uses the term "periodically" in lieu of "time to time." Otherwise the language is identical.

16

"[S]ince January 2017, we have been unable to provide inforce illustrations on about 4,000 Performance UL policies issued between 2003 and 2010, pending a review of emerging experience. That review is now complete and we are now able to provide inforce illustrations on all Performance UL policies. Also, as a result of changes in our expectations of future mortality and lapse experience, we will be increasing the Cost of Insurance rates on a subset of these policies. Overall, this increase impacts approximately 1,500 policies, and the amount of the increase will vary by policy. … We are sending letters to all affected policyholders to inform them of the increase …"

40.     The size of the COI Increase varies wildly among those targeted for the increase, and John Hancock does not explain that variance or even tell policyholders the size of their increase. For example, John Hancock did not tell Ms. Poplawski how much she had to raise her premiums to keep her policy in place. But reverse engineering the John Hancock illustrations shows that the Poplawski Trust will have to pay approximately 70% per year more to keep the policy in force as a result of the COI increase—approximately $225,000 more annually. John Hancock provided no explanation for this massive increase above what had been her "projected" COI rates, even after large premiums had been paid on the policy for 10 years as part of her estate plan.

41.     Even these limited disclosures to policyholders and John Hancock's agents were false. The COI Increase was not the "result of" a recent review of "emerging experience."

42.     As confirmed by discovery obtained to date, which remains ongoing, the COI Increase violates the terms of the Subject Policies in at least the following ways.

(i)     **The COI Increase Was Not Based on the Enumerated Factors nor on Changes Since the Most Recent Review**

43.     The John Hancock contracts governing the Subject Policies state (with one variation) that the COI rates "will be based on [John Hancock's] expectations of future mortality, persistency, investment earnings, expense experience, capital and reserve requirements, and tax

assumptions."[6] But no change to any of these enumerated factors independently, nor when considering all of the enumerated factors together as required, could warrant the massive COI increase.

44.     John Hancock has identified two factors as the primary drivers for the increase: "changes in [John Hancock's] expectations of future mortality and lapse experience." Not only did John Hancock ignore positive changes in the other enumerated factors (like the $240 million tax benefit, for example), but recent changes in mortality, lapse, or any other factor could not possibly warrant an increase, much less one of this massive size.

### a.  Expectations of Future Mortality Experience Have Improved

45.     Beginning at least as early as 1980, the National Association of Insurance Commissioners (NAIC) has issued a series of mortality tables, which reflect expected mortality rates for insureds derived from data collected from insurance companies. The 1980 table issued by the NAIC was called the 1980 Commissioners Standard Ordinary Smoker or Nonsmoker Mortality Table ("1980 Mortality Table"). Industry expectations of mortality experience have improved each year since the 1980 table issued.

46.     In 2001, at the request of the NAIC, the Society of Actuaries (SOA) and the American Academy of Actuaries (Academy) produced a proposal for a new CSO Mortality Table. The accompanying report from June 2001 explained that (a) the 1980 CSO Mortality Table was commonly used in the industry and (b) mortality rates and expectations had improved significantly each year since the 1980 table issued. The report stated:

> The current valuation standard, the 1980 CSO Table, is almost 20 years old and mortality improvements have been evident each year since it was adopted . . . . [C]urrent mortality levels . . . are considerably lower than the mortality levels underlying the 1980 CSO Table.

---

[6] The policies also refer to COI rates as "Applied Monthly Rates."

47.     The report further explained that "[f]or most of the commonly insured ages (from about age 25 to age 75), the proposed 2001 CSO Table mortality rates are in the range of 50% to 80% of the 1980 CSO Table." The final proposed tables were adopted as the 2001 Commissioners Standard Ordinary Mortality Table ("2001 CSO Mortality Table"). The 2001 CSO Mortality Table reflected vastly improved mortality experience and expectations as compared to the 1980 CSO Mortality Table.

48.     The 2001 CSO Mortality Table was generated from the 1990-95 Basic Mortality Tables published by the Society of Actuaries. The Society of Actuaries performs surveys of large life insurance companies for the death rates actually observed in their policies and compares them to published mortality tables. Periodically the Society will publish an updated table to reflect the evolving industry experience and expectations. Major updates they have published over the last few decades include:

- 1975-1980 Basic Select And Ultimate Mortality Table
- 1985-90 Basic Select and Ultimate Mortality Tables
- 1990-95 Basic Select and Ultimate Mortality Tables
- 2001 Valuation Basic Mortality Table
- 2008 Valuation Basic Table
- 2015 Valuation Basic Table

49.     The 1990–1995 Basic Table reflected the death rates observed by 21 large life insurance companies (including John Hancock) with policy anniversaries between 1990 and 1995. The 2001, 2008, and 2015 Valuation Basic tables each show significant mortality improvements from the 1990–1995 Basic Tables demonstrating that since the introduction of the 2001 CSO Mortality Table, mortality experience has continued to improve substantially and consistently.

50.     This trend of improving mortality expectations has continued to the present day in the industry. In 2017, the SOA published a study with recommendations for mortality improvement assumptions for insurance reserving for AG-38 (Actuarial Guideline No.38), which

covers reserving for certain universal life insurance policies. The SOA updates this study annually and these studies show improving mortality across the board for the last 5 years, with no negative figures in any published table from 2013 and 2017. These mortality improvements represent a substantial benefit that John Hancock should have passed on to Subject Policyholders, in the form of cheaper COI rates, but never did.

51.     Industry insiders also report continuing and consistent mortality improvements. For example, in 2016, Towers Watson, which insurers frequently cite to, published a report with recommendations for improvement assumptions for insurance companies. All assumptions over age 55 are positive improvements, meaning that Towers Watson expects that mortality will continue to improve at every age. Similarly, statistics published by The Human Mortality Database (HMD, organized by the Department of Demography of the University of California, Berkeley), show increases in life expectancy and lowering of mortality rates between 2010 and 2015 for older-aged individuals in the United States. And a SOA report on historical population mortality rates shows continuing mortality improvements every five years between 2000 and 2014.

52.     John Hancock says that it partly relies on this type of industry data in setting its mortality expectations, stating that "[m]ortality assumptions are based on our internal as well as industry past and emerging experience," and that it makes "assumptions about future mortality improvements using historical experience derived from population data." Any suggestion by John Hancock that its mortality expectations were legitimately developed in a way that is the polar opposite of the industry is implausible. Even if John Hancock had some decline in mortality expectation, contrary to the industry, that decline could not be close to warranting the massive increases seen here.

53.     Every year, John Hancock files responses to form interrogatories with the NAIC, which are signed by an actuary at John Hancock, concerning John Hancock's "non-guaranteed elements" (which include COI rates). One of the form interrogatories asks insurers whether "the anticipated factors underlying any nonguaranteed elements" are different from current experience, and if so, insurers must describe in general the ways in which "future experience is anticipated to differ" and "the nonguaranteed element factors that are affected by such anticipation." For each year between 2006 and 2015, through February 2016, John Hancock stated that, with exceptions not relevant here, "the anticipated experience factors underlying any nonguaranteed elements are not different from current experience" and that it "does continue to monitor experience." This means that as of February 2016, John Hancock admitted that its expectations of future mortality experience had not differed from its original expectations, and that no COI increases were on the horizon (or it means that John Hancock had adopted new anticipated experience factors as those that would "underly[] nonguaranteed elements" going forward). There have not been adverse experience and expectations within recent years, or since February 2016, that could justify an increase in COI rates, and certainly not one of this size.

54.     Similarly, John Hancock made various representations to its Canadian regulator—OSFI—regarding the COI rates on the Subject Policies. ███████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████ (emphasis added). Again, nothing materially changed between the

dates of these ████████ and the COI Increase. By December 2015, John Hancock had already

adopted at least two new mortality tables—JH11 and JH14—and recognized and wrote off any

losses associated with them.

55.     Up until January 2017, John Hancock also repeatedly represented to owners of the

Subject Policies that John Hancock's expectations of future experience had not differed from those

that were used to price the initial COI rate scale, which had not changed since the policies issued.

The Subject Policies promise that John Hancock will provide a report of "projected future values"

for the policy "upon request," and these reports are commonly referred to in the industry as

"illustrations." John Hancock sent illustrations to named plaintiffs between at least June 2013 and

February 2018, all of which gave "projected future values" for the policy *using the cheaper pre-*

*increase COI rates*. Mortality experience has not changed for the worse since these illustrations

were sent, and certainly not in a manner to justify these massive increases.

56.     Illustration standards of practice promulgated by the Society of Actuaries, and

incorporated into state law, require that illustrations depict future values using COI rates that are

"reasonably based on actual recent historical experience." In January 2017, John Hancock began

informing many of the PUL policyholders who requested an illustration that it could no longer

issue illustrations because regulatory standards that govern illustration practices allegedly

prevented John Hancock from "illustrating the currently payable amounts based on our current

non-guaranteed elements" because "emerging experience has differed from the current

assumptions which are reflected in the illustrations." As John Hancock admitted in that

correspondence sent to policyholders, John Hancock cannot illustrate current COIs if its expected

future experience is worse than the "current assumptions which are reflected in the illustrations"—

*i.e.*, if its expectations of future experience are worse than the expectations that underlie the

original pricing of the COI rates. Put another way, by illustrating cheaper COI rates up through the end of 2016, which depicted "projected future values" using pre-increase cheaper COI rates, John Hancock represented that its then-current expectations were no worse than the assumptions it used to price the policies, which are reflected in the illustrations. And yet, John Hancock continued issuing illustrations for some Subject Policies up through at least February 2018—meaning either that (1) John Hancock unlawfully provided misleading illustrations for these policies throughout the time period, or (2) there was no divergence in assumptions that would warrant any increase for these policies. Because John Hancock's mortality expectations, which it claims to monitor at least annually, could not have had changed dramatically for the worse since January 2017 (or February 2018 or 2013) for the reasons above, the massive COI Increase cannot be justified by any change in those expectations.

57.     Similarly, the Subject Policies require that the COI rates "will be reviewed at least once every 5 Policy Years" or "from time to time." The purpose of this provision—like the illustration rules and the NAIC interrogatory question discussed above—is to prevent John Hancock from engaging in a bait-and-switch tactic, where it projects cheaper COI rates in the future than its current expectations would warrant, collects premiums during that time, and then turns around many years later and reveals that COI rates will be raised because of changed expectations that, if believable, the insurer must have known about at least since the illustrations and interrogatory responses were filed. Rather, these provisions require John Hancock to periodically review COI rates and, if it so chooses consistent with the contractual requirements and applicable actuarial standards and law, make any changes *at that time.* If John Hancock elects not to make any changes to COI rates at that time, it cannot then go back and try to recoup losses that were recognized during prior review periods. Yet this is exactly what John Hancock did.

58.     When filing the policy form on which many Subject Policies were issued, John Hancock also told regulators that "[t]he cost of insurance rates will be determined at the beginning of each policy year." The purpose of this promise is also to prevent John Hancock from engaging in the bait-and-switch tactics that it engaged in here, by springing a massive COI Increase in 2018 that could not be warranted by any recent change in its experience or expectations.

59.     In order to increase its market share, John Hancock deliberately chose to use aggressive pricing assumptions, particularly as it relates to mortality and lapse. As new versions of Performance UL were introduced, John Hancock began gradually to revise these assumptions, but without changing COI rates or illustrated rates for already-issued policies. By 2010, John Hancock developed a new mortality table named JH10. After postponing JH10 for a year, it adopted the new mortality table in 2011 for policies including the PUL policies, and named it JH11. The adoption of JH11, combined with new lapse assumptions, forced John Hancock to reduce the mortality and lapse "basis" on the Performance UL policies by *$404 million*. What this means is that John Hancock recognized future losses of $404 million on the Performance UL policies. Despite this, John Hancock *chose* not to change COI rates, continued illustrating current rates, and continued representing to regulators that the anticipated experience underlying the existing non-guaranteed elements was not materially different than current experience. In other words, at that time, John Hancock thus adopted JH11 as the new baseline for any subsequent redetermination.

60.     John Hancock then further revised its mortality and lapse assumptions in 2014, this time recognizing a $342 million loss and adjusting the cost basis of the Performance UL policies accordingly. John Hancock's new mortality assumptions were memorialized in a new mortality table, JH14. Again, John Hancock absorbed the loss, chose not to change COI rates, continued

illustrating current rates, and continued representing to regulators that the anticipated experience underlying the existing non-guaranteed elements was not materially different than current experience. This again reset the baseline at that time for any subsequent redeterminations.

61.     Notably, throughout this period John Hancock was redetermining non-guaranteed elements on the Performance UL policies. According to John Hancock, it engaged in a "ongoing assessment and review" of COI rates during this period and, because it chose to accept these losses, it repeatedly concluded ███████████████████ that no change in COI rates was warranted. Further, John Hancock repeatedly redetermined credited interest rates during this period, which the contract states will be based on "our expectations for the Guaranteed Interest Account's future investment earnings, persistency, mortality, expense and reinsurance costs and future tax, reserve, and capital requirements" or "our expectations of future investment earning, persistency, mortality, expense and reinsurance costs and future tax, reserve and capital requirements." Each time that John Hancock chose to change credited rates, it chose not to change COI rates.

62.     Finally, in 2017, Manulife's CEO Roy Gori announced Manulife's "number one" priority was to "aggressively manage" its legacy blocks to "**increase profitability** and cash generation," and that "shareholder returns" will be a big part of how Manulife measures "progress in our legacy business." This prompted a review of COI rates on the Performance UL policies. Despite having an obligation to review COI rates from "time to time" and "at least once every five years" and having redetermined non-guaranteed elements multiple times since pricing, John Hancock apparently now claims that it can increase COI rates by comparing of (i) its original pricing assumptions with (ii) its current expectations and thereby recoup the losses it wrote off in 2011 and 2014. It cannot.

63.     Further, even if John Hancock had been entitled to use its original pricing assumptions as a baseline—which it was not—John Hancock mistranslated, manipulated, and selectively used its expectations of future mortality, persistency, investment earnings, expense experience, capital and reserve requirements, and tax assumptions in order to justify a higher increase.

64.     John Hancock misrepresented numerous facts to regulators. For example, it repeatedly suggested that increase was driven by recent changes in mortality and lapse. In its presentations to NYDFS, John Hancock presented only comparisons of John Hancock's original mortality tables and the recently adopted JH17, thereby implying that what the NYDFS termed the unreasonableness of its original mortality table was only recently discovered. John Hancock did not mention any of its intermediate mortality tables, such as JH10, JH11, or JH14, or that it had been deceptively illustrating policy values for years. Similarly, John Hancock repeatedly stated that it was not recouping past losses, and specifically that "[h]istorical mortality and lapse losses of ~130M on this product series were not recouped." John Hancock did not disclose that hundreds of millions of dollars of previously recognized losses *were* being recouped. It also told other regulators and agents that the review was triggered by "emerging experience"—not experience that occurred at least eight years prior.

### b.  John Hancock Ignores the Enumerated Factors That Benefit John Hancock, Like Taxes

65.     While one set of policies require that COI rates "will be based on [John Hancock's] expectations of future mortality, persistency, investment earnings, expense experience, capital and reserve requirements, and tax assumptions," John Hancock indicated to its agents that it ignored all but two of these factors and imposed the increase "as a result of changes in our expectations of future mortality and lapse experience" alone. But John Hancock may not ignore improvements to

the other four enumerated factors that it does not like. For example, John Hancock ignores the massively beneficial improvements to its "tax assumptions."

66.     Manulife, which owns and reports on behalf of John Hancock and its affiliates in the United States and international companies, has recently been publicly touting the massive benefits of U.S. Tax reform to its US operations. For example, in early 2018, Manulife said that the expected "impact" of "U.S. Tax Reform" enacted in the fourth quarter of 2017 is "an expected ongoing benefit to net income attributed to shareholders and core earnings of approximately **$240 million per year commencing in 2018**." This is on top of a series of "refinements" to John Hancock's actuarial models to "more accurately reflect the impact of tax timing differences on policy liabilities." John Hancock told investors that "[t]hese refinements resulted in a benefit to net income of $696 million."

67.     But John Hancock simply ignored this massive expected future tax benefit, even though the policies list expectations of future "tax" assumptions as one of the factors that COI Rates "will be based on."[7] Indeed, John Hancock's actuarial consultant, Milliman even called out John Hancock's failure to consider taxes, stating in an email: "analysis ignored taxes (as was done previously); specifically pointed out that reduction in future corporate tax rate was excluded from rate determination analysis."

68.     Similarly, John Hancock recently admitted that as a result of a review of its future corporate "spread assumptions," it claimed a $344 million benefit to net income attributed to shareholders. And yet John Hancock ignored this too, even though investment earnings are listed as another enumerated factor and had improved.

---

[7] Manulife also reported that it took a charge for the US tax cut in 4Q 2017, but that past charge is irrelevant: COI rates can only be based on John Hancock's "*expectations* of *future*" experience and John Hancock only claims that the increase is justified by changes in its "expectation of future experience." Further, John Hancock's expected future earnings from the tax cut will soon dwarf any past losses.

69.     Discovery produced to date also indicates that John Hancock either ignored or improperly reflected other enumerated factors in its redetermination methodology, including, for example, by not including extended maturity option reserves in repricing runs.

70.     John Hancock cannot pick and choose to consider only the enumerated factors that it claims warrant an increase, while ignoring hundreds of millions of dollars in admitted improvements that would require a decrease. But that is exactly what John Hancock did. If John Hancock had considered its future expected tax and investment benefits, along with other improvements to the enumerated factors, then the COI increase was not warranted. No change to any individual enumerated factor, even if considered in a vacuum, could have justified an increase of this size. And considering all of the enumerated factors together, as required, confirms that John Hancock breached its policies and unlawfully raised COI rates on the Subject Policies.

### c.   John Hancock Improperly Hiked COI Rates to "Increase Profitability"

71.     The COI increase was also driven by John Hancock's desire to increase profits, which is not an enumerated factor. On an earnings call in October 2017, Manulife's CEO acknowledged that the company's North American legacy business (which includes the policies hit by this increase) was generating "less than acceptable returns." On the same earnings call, CEO Gori further said that Manulife's "top priority" is to "aggressively manage" its legacy blocks to "**increase profitability** and cash generation." This COI Increase, which was announced 6 months later, is part of Manulife's effort to "increase profitability" on the legacy block of PUL policies issued between 2003 and 2010. But increasing profits is not an enumerated factor on which an increase can be based under the terms of the Subject Policies.

### d.   John Hancock's Lapse Expectations Cannot Justify this Massive Increase

72.     The policy lists "persistency" as one of the enumerated factors. John Hancock claims that the increase is partly driven by a change in its expectations of future "lapse experience." But no change in lapse expectations could warrant an increase, much less one of this size, and John Hancock appears to misinterpret the "persistency" factor.

73.     John Hancock told regulators as recently as a sworn filing in February 2016 that "the anticipated experience factors underlying any nonguaranteed elements," such as its lapse expectations, "are not different from current experience." There was no deterioration in lapse experience in the last 2 years that warranted a change in lapse expectations for the worse, and certainly not so much as to cause this massive increase.

74.     Further, the Subject Policies all issued between 2003 and 2010, so they have all been in force between 8 and 15 years. Any adverse lapse experience would have been detected in the early years of the policies, not in the later years. A 2012 industry study published by the Society of Actuaries—reporting on a survey of the industry including John Hancock—indicated that between 2001 and 2009, the industry lapse rates for universal life policies that have been in force more than 6 years are stable, varying less than approximately 2 percentage points over that span, and that the lapse rates become more stable the longer the policy has been in force. This indicates that any volatility that John Hancock may have seen in these policies would have occurred in the early years, not now. Moreover, on the November 2017 earnings call, Manulife explained that Manulife's review of lapses in 2017 only focused "on lapse in Canada and parts of Asia," and that Manulife anticipates that it will "be reviewing lapse in the U.S. next year." Given that John Hancock did not even conduct a "deep dive" review of its lapse assumptions in 2017 for U.S. business, John Hancock could not possibly have had a recent change in lapse expectations that would justify this massive increase.

75.     Further, John Hancock reduced its lapse expectations while repricing the Performance UL policies from 2005 to 2010. In 2011, John Hancock recorded a massive cost basis adjustment when relating to lapse expectations. It recorded another massive cost basis adjustment again in 2014. Under the policy terms, any change in COI rates needs to be made when experience changes and non-guaranteed elements are reviewed. Having decided to absorb the alleged losses associated with its original assumptions, not change rates, and continue illustrating current rates, John Hancock was only permitted to change rates in response to future changes in expectations as compared to the expectations in place at the last review—not changes from almost a decade earlier.

76.     John Hancock also appears to misinterpret the "persistency" factor to mean that John Hancock is permitted to raise COI rates when *fewer* people lapse than John Hancock expected. A 2016 industry study by A.M. Best—an entity whose ratings Manulife quotes on its website—indicates that industry lapse rates were at 20-year lows between 2012 and 2015. Similarly, John Hancock's 2016 financial statement indicated that lapse rates for its low-cost universal life products were reduced, which led to a decrease in net income attributed to shareholders. While an insurer may contend that in some circumstances it should be permitted to consider the loss of income resulting from a *higher* lapse rate, it may not use a lower lapse rate to justify a COI increase on the theory that John Hancock had hoped to profit more from elderly insureds forgetting to pay their premiums. The policy does not permit John Hancock to punish its customers for paying their bills on time. As John Hancock told policyholders in announcing the rate hike, if policyholders do not increase their premiums or reduce their death benefit, then their policies will lapse. This is part of John Hancock's design: it is using the increase to try to force policy lapses by virtue of burdensome premium increases—an unlawful tactic known in the industry as "shock lapses."

### e. John Hancock Improperly Used Reinsurance Rate Increases to Further Inflate the COI Increase

77.     John Hancock entered into a number of reinsurance treaties applicable to the Subject Policies. Several of those treaties contained a provision whereby the reinsurer was permitted to raise reinsurance rates in the event that John Hancock raised COI rates. Despite the fact that these increases ***were only made in response to the underlying COI increase***, John Hancock factored these future rate increases into its increase methodology. So, for example, if John Hancock would have otherwise imposed a 40% rate increase, it then increased that amount further—to 60% or higher—to account for the reinsurer's anticipated reaction to the COI increase. This is problematic and unlawful for several reasons. ***First***, one of the policy forms does not permit reinsurance costs to be considered at all. When Performance Core and Performance Core Reprice were introduced in 2003 and 2005, "reinsurance costs" were included in the enumerated factors. But when Performance UL 06 was introduced, John Hancock deliberately eliminated "reinsurance costs" from the list of permissible factors, and continued to omit it from all subsequent product versions. ***Second,*** even for policies that allow consideration of reinsurance costs, it is illogical and unreasonable to include reinsurance rate increases that were initiated ***in response*** to the COI rate hike initiated by the insurer. COI adjustments are supposed to be a reaction to recent changes in expectations—not the trigger for changes in expectations that, in turn, are circularly used to rationalize the increase. ***Third***, the reinsurance rate increases modeled by John Hancock did not in fact reflect the reinsurance rate increases ultimately imposed by reinsurers or John Hancock's expectations. Notably, John Hancock and its reinsurers agreed that, in the event that the COI Increase was found unlawful or voided, the reinsurer would refund the excess reinsurance charges to John Hancock. This arrangement smacks of collusion and deception. The purpose of a provision allowing a reinsurer to increase reinsurance rates in response to a COI Increase is that the insurer

is in the best position to estimate the experience of the policies. If an insurer raises COI rates, the reinsurer assumes that the insurer knows something that the reinsurer does not and that claims are going to go up. So the reinsurer thus wants to be protected from this risk. John Hancock's "rebating" arrangement with its reinsurers is wholly inconsistent with this premise; if the reinsurers truly believed John Hancock's expectations, it should want rates increased regardless of whether the COI Increase itself violates the terms of John Hancock's policies. That John Hancock's reinsurers did not demand this indicates that they too realized that John Hancock's purported "expectations" were not realistic, and were being manipulated by John Hancock to justify a massive profit grab from policyholders.

### f. None of the Remaining Enumerated Factors Can Justify this Massive Increase

78.     No change to any of the enumerated factors (independently or when considered together) could warrant this massive increase, and John Hancock improperly based the increase on many factors not enumerated in the policy, including by using higher COI rates when account values were low, even though account value is not an enumerated factor on which COI rates may be based.

### (ii)     The COI Increase is Non-Uniform and Discriminatory

79.     The policies require that any change in COI rates will be "on a basis that does not discriminate unfairly within any class of lives insured" or "will be made on a uniform basis for insureds of the same sex, Issue Age, and premium class, including smoker status, and whose policies have been in force the same length of time." These uniform or non-discrimination clauses are common in the industry. At a minimum, they require that any COI increase will comply with actuarial principles, ensuring that no policyholder will be selected for an increase, or selected for an increase that is too large, for reasons that are not actuarially permissible. In its sworn

interrogatory responses to regulators, John Hancock adopts the principle that "no aspect of the determination of nonguaranteed elements not covered above involves material departures from the actuarial principles and practices of the American Academy of Actuaries, applicable to the determination of nonguaranteed elements."

80.     The increase is discriminatory and non-uniform in numerous ways. For example, John Hancock has (inaccurately) told its agents that it is applying increases to 1,500 of the 4,000 PUL policies that it reviewed, and, on information and belief, there are thousands more PUL policies issued between 2003 and 2010 that were not reviewed. The variations in increase percentages defy logic on their face. For example, the increase was applied to a standard male insured with issue age 73, but not to a standard male insured with issue age 65, and there is no actuarial reason to treat those two policies in such wildly disparate manners. Similarly, John Hancock has applied increases approximately of: an increase of 20% on a policy where the female insured was standard non-smoker and 80 years old when the policy issued in 2006; an increase of 41% on a policy where the female insured was standard non-smoker and 86 years old when the policy issued in 2007; an increase of 27% on a policy where female insured was standard non-smoker and 77 years old when the policy issued in 2007; an increase of 30% on a policy where the female insured was standard non-smoker rated and 82 years old when the policy issued in 2007; an increase of 65% on a policy where the female insured was preferred non-smoker and 82 years old when the policy issued in 2008; an increase of 64% on a policy where female insured was preferred non-smoker and 80 years old when the policy issued in 2008. These disparate rate hikes, which have no actuarial support for the wide variances, alone violate John Hancock's obligation to implement increases in a uniform and non-discriminatory manner.

81. Further, John Hancock imposed increases that varied by issue age down to the year. This too violated the terms of the policies because John Hancock did not define policy or premium classes by year, nor was there any actuarial support for doing so, and as a result, the increase discriminates unfairly within classes of insureds and is not on a uniform basis.

82. Further compounding the problem, John Hancock appears to have extensively engaged in a practice called "table shaving" and failed to correct for that practice in connection with the COI increase. Table shaving occurs when an insurer assigns an insured to a more favorable rate class that he or she did not qualify for under the insurer's underwriting standards. Though now highly disfavored, it was commonly used by insurers for competitive reasons and as a favor to valued brokers and customers. Table shaving distorts the experience of each class. When an insurer assigns standard insureds to the preferred rating class, or assigns substandard insureds to a standard rating class, it drags down the experience for each rating class, thereby making each class's experience appear worse than it would have been if John Hancock had actually followed its underwriting guidelines. This too constitutes unfair discrimination, creates a lack of uniformity, and also causes COI rates to be based on unenumerated factors (specifically, John Hancock's sales practices and disregard for its own underwriting standards). Indeed, John Hancock itself recognized that it would constitute unfair discrimination to take into account its sales practices, and purported to disregard changes in business mix in connection with the COI Increase. But it has not produced any evidence that it controlled for these effects or for table shaving. Further, the increase was discriminatory and not uniform because substandard policies were grouped with the standard risk class for the increase, in violation of the policies.

83. Also notable is that John Hancock has not announced an increase in COI rates for any other UL policies besides the subset of policies that are subject to the increase discussed above

–even though John Hancock issued other universal products between 2003 and 2010 (such as Majestic UL, SVULZ and Majestic VULX) which, by John Hancock's own admission, shared the same initial mortality assumptions as the PUL products hit by the increase. Indeed, John Hancock did not raise COI rates for any Performance UL 10 policies, despite that fact that it is part of the Performance UL series and was priced using the same base mortality table as Performance UL 08, Performance UL 08r, and Performance UL 09. Had John Hancock determined COI increases "based on expectations" as to mortality and lapses, as it claims, then its COI rates would have increased for a broad range of life insurance policies, and not just PUL. That John Hancock did not implement any such broad increase confirms that the COI increases are being unlawfully used to target certain policies and policyholders in an inequitable manner and based on improper factors not provided for in the policy.

84.     Lastly, after implementing the COI Increase on hundreds of policyholders, John Hancock began contacting some smaller subsection of absent putative class members in an effort to settle their claims related to this lawsuit. On information and belief, John Hancock has offered cash, lower face value policies, and promises to defer increasing COI rates for a few years in exchange for a putative class member releasing claims against the company. John Hancock's selective settlement efforts and side deals with absent class members are not "made on a uniform basis for insureds of the same sex, Issue Age, and premium class, including smoker status, and whose policies have been in force the same length of time" as the policies require, and constitute unfair discrimination, in violation of the policies. Indeed, New York, along with many other states, explicitly prohibits these types of side deals and rebating schemes.

**(iii)     The COI Increase Recouped Past Losses**

85.     The contract requires that COI rates "will be based on our expectation of *future*" experience factors. This forbids COI increases that are based on a carrier's desire to increase profits or to make up for past losses. Basic actuarial principles that are incorporated into the contract also prohibit the carrier from implementing a COI increase that would result in the carrier making more profit on the policies than it previously expected using its prior expectations. In an October 2017 earnings call, John Hancock admitted that the steps it was about to take, which included the COI Increase, were part of its effort to "aggressively manage" its legacy blocks in an attempt to "increase profits," in response to "less than acceptable returns" in the past. That is impermissible recouping of past losses.

86.     The facts stated above, which indicate that a COI increase of this magnitude could not be supported by any recent changes in John Hancock's *future* cost expectations, also confirm that John Hancock is increasing its profit targets on an old, closed block. In addition, the illustrations sent up through then end of 2016, and even up through February 2018, were required to use then-current mortality assumptions. Because mortality assumptions have not materially changed since that time, the new increase massively increases John Hancock's profits on the policies, as compared to the profit margin that John Hancock was projecting in illustrations sent up through 2016, and even February 2018.

87.     In its financial statements, Manulife (reporting for John Hancock) claims to do an annual "full year review" of its actuarial assumptions, including its mortality assumptions. In the interrogatories it files with regulators, John Hancock has also told regulators that it applies its updated mortality assumptions "by risk classification across all product lines." To the extent John Hancock's mortality has not been as good as it originally expected for some of these policies, those losses were recognized and accepted by John Hancock long ago, thereby establishing a new

baseline for any future increase. John Hancock cannot use a COI increase now to make up for these alleged past losses, and which it certified as being the "anticipated experience factors underlying [its] nonguaranteed elements." To do so would be to recoup past losses, in violation of the policy and actuarial principles. In addition, John Hancock overstated the original profit margins by using central age mid-points for single life UL products, which led to recouping past losses and to discriminatory and non-uniform increases.

## **CLASS ACTION ALLEGATIONS**

88.    This action is brought by Plaintiffs individually and on behalf of the following class—referred to herein as the "COI Increase Class"—which consists of:

> All owners of universal life insurance policies issued by John Hancock Life Insurance Company (U.S.A.), John Hancock Life Insurance Company of New York, or their predecessors, successors, or subsidiaries, or affiliates subjected to the cost of insurance rate increase announced beginning in 2018 and continuing into 2019, excluding defendant John Hancock, its officers and directors, members of their immediate families, and the heirs, successors or assigns of any of the foregoing, and the policies-in-suit in the Related Actions.[8]

89.    This action is also brought on behalf of PBR Partners, Trinity, ATLES, and all members of the COI Increase Class where the policy was issued by JHNY or its predecessors or was acquired by JHNY (the "New York Sub-Class").

90.    This action is also brought on behalf of the Poplawski Plaintiffs, ATLES, and all members of the COI Increase Class where the policy was issued for delivery in California (the "California Sub-Class").

---

[8] The "Related Actions" are the following pending federal and state actions: *LSH CO et al. v. John Hancock Life Insurance Co. et al.*, No. 19-cv-01009-AKH (S.D.N.Y.); *Davydov v. John Hancock Life Insurance Company of New York*, No. 18-cv-09825-AKH (S.D.N.Y.); *EFG Bank AG et al. v. John Hancock Life Insurance Co. et al.*, No. 19-cv-1696-JAK (C.D. Cal.); *Twin Lakes Settlements, LLC et al. v. John Hancock Life Insurance Company of New York et al.*, No. 655429/2018 (Complaint Filed November 1, 2018 N.Y. Sup. Ct.); and *Lipschitz et al. v. John Hancock Life Insurance Company of New York*, Dkt. No. 655579/2019 (Complaint Filed September 25, 2019 N.Y. Sup. Ct.).

91.     This action is also brought on behalf of ATLES and all members of the COI Increase Class where the policy was issued for delivery in Texas (the "Texas Sub-Class").

92.     This action is also brought on behalf of Brighton Trustees, LLC, Cook Street Master Trust III, ATLES, and all members of the COI Increase Class where the policy was issued for delivery in New Jersey (the "New Jersey Sub-Class").

93.     The COI Increase Class, New York Sub-Class, California Sub-Class, Texas Sub-Class, and New Jersey Sub-Class each consist of at least forty of consumers of life insurance and is thus so numerous that joinder of all members is impracticable. The identities and addresses of class members can be readily ascertained from business records maintained by John Hancock.

94.     The claims asserted by Plaintiffs are typical of the claims asserted by the COI Increase Class, New York Sub-Class, California Sub-Class, Texas Sub-Class, and New Jersey Sub-Class.

95.     Plaintiffs will fairly and adequately protect the interests of the each of the classes that they seek to represent and do not have any interests antagonistic to those of the other members of this class.

96.     Plaintiffs have retained attorneys who are knowledgeable and experienced in life insurance matters, COI increase matters, as well as class and complex litigation.

97.     Plaintiffs request that the Court afford class members with notice and the right to opt-out of any class certified in this action.

98.     This action is appropriate as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure because common questions of law and fact affecting the class predominate over those questions affecting only individual members. Those common questions include:

(a)     the construction and interpretation of the form insurance policies at issue in this litigation;

(b)     whether John Hancock's actions to increase the cost of insurance charges on certain UL policies violated the terms of those form policies;

(c)     whether Plaintiffs and Class members are entitled to receive damages as a result of the unlawful conduct by defendant alleged herein and the methodology for calculating those damages.

99.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

(a)     because of the complexity of issues involved in this action and the expense of litigating the claims, few, if any, class members could afford to seek legal redress individually for the wrongs that defendant committed against them, and absent class members have no substantial interest in individually controlling the prosecution of individual actions;

(b)     when defendant's liability has been adjudicated, claims of all class members can be determined by the Court;

(c)     this action will cause an orderly and expeditious administration of the class claims and foster economies of time, effort and expense, and ensure uniformity of decisions;

(d)     without a class action, many class members would continue to suffer injury, and defendant's violations of law will continue without redress while defendant continues to reap and retain the substantial proceeds of its wrongful conduct; and

(e)     this action does not present any undue difficulties that would impede its management by the Court as a class action.

## FIRST CLAIM FOR RELIEF

### Breach of Contract against John Hancock (on behalf of Plaintiffs and the COI Increase Class)

100.    Plaintiffs reallege and incorporate all allegations of this complaint as if fully set forth herein. This claim is brought on behalf of all Plaintiffs and the COI Increase Class.[9]

101.    The subject policies are binding and enforceable contracts.

102.    The 2018 COI rate increases and conduct by Defendants that preceded it have materially breached the policies in several respects, including but not limited to:

(a)     not determining COI rates based on the factors enumerated in the policies;

(b)     not basing the adjustments on expectations of John Hancock's future experience;

(c)     using modified original pricing assumptions as the baseline for Hancock's increase, as opposed to assumptions from the last time it reviewed non-guaranteed elements within the past five years;

(c)     imposing non-uniform and unfairly discriminatory rate hikes on insureds;

(d)     imposing a massive increase in COI rates to recoup past losses;

(e)     failing to provide an illustration upon request; and

(f)     improperly breaching the covenant of good faith and fair dealing.

103.    Plaintiffs have performed all obligations under the policies, except to the extent that its obligations have been excused by John Hancock's conduct as set forth herein.

---

[9] In the alternative, Plaintiffs may seek certification on the breach of contract claim of a class of all members of the COI Increase Class whose policies were issued for delivery in the same states as Plaintiffs' policies: New York, California, Texas, New Jersey, Arizona, Colorado, Delaware, Florida, Illinois, Minnesota, North Carolina, Pennsylvania, and Virginia.

104.    As a direct and proximate cause of John Hancock's material breaches of the policies, Plaintiffs have been—and will continue to be—damaged as alleged herein in an amount to be proven at trial and are entitled to an injunction to prevent John Hancock from failing to comply with its contractual promise to provide an illustration "upon request" to the COI Increase Class.

**SECOND CLAIM FOR RELIEF**

**Violation of New York Insurance Law, Section 4226 (against JHNY on behalf of Plaintiffs PBR Partners, Trinity, and the New York Sub-Class)**

105.    Plaintiffs reallege and incorporate all allegations of this Complaint as if fully set forth herein. This claim is brought on behalf of the Plaintiffs PBR Partners, Trinity, and the New York Sub-Class.

106.    New York Insurance Law Section 4226(a) imposes liability on any insurer that (a) issues or circulates any illustration, circular, statement, or memorandum misrepresenting the terms, benefits, or advantages of any of its insurance policies, and (b) makes any misleading representation, or any misrepresentation of the financial condition of any such insurer. N.Y. Ins. Law § 4226(a)(1) & (4).

107.    If John Hancock's mortality expectations substantially decreased while industry mortality expectations substantially improved as John Hancock has represented, then JHNY applied unreasonable extreme and aggressive reductions to the mortality tables when setting original pricing of the Subject Policies in order to make JHNY's product look substantially cheaper in the future than the products of its competitors and gain market share. In other words, if John Hancock's story is to be believed, then JHNY would have known at policy issuance, and in recent years, that its future mortality expectations were too optimistic, and yet it continued to "project" future cheaper COI rates than its actual expectations permitted. Indeed, JHNY recorded substantial

cost basis adjustments in 2011 and 2014, which it now seeks to use to justify the rate hike, yet continued to represent to policyholders that the illustrated policy values were based on recent historical experience. Accordingly, under JHNY's own version of events, JHNY engaged in a bait-and-switch by projecting unreasonably low future COI rates at initial pricing and in those illustrations sent from issuance through February 2018 and then raising those rates after collecting hundreds of millions in premiums.

108.    And in fact, the NYDFS found that JHNY used overly aggressive and unreasonable assumptions in marketing and pricing the Subject Policies, and made a regulatory finding that JHNY's "original pricing assumptions were aggressive and not reasonable," and that "[u]se of reasonable assumptions would have shown much greater expected future losses" than those advertised at policy issuance.

109.    It follows that the illustrations provided to Plaintiffs, and owners of the Subject Policies, depicted performance more favorable to the policy holder than would have been possible using a scale that was reasonably based on John Hancock's recent experience, and depicted COI rates to policy holders that were not based on "reasonable actual recent historical experience."

110.    At pricing and throughout the class period up until at least February 2018, John Hancock prepared and circulated false and misleading illustrations to members of the New York Sub-Class (and any predecessors-in-interest) at least on or about the following dates: June 2013 and February 2018 for the Jacobs policy; September 2016 for the Trinity policy; and September 2017 for an ATLES policy. Each of these illustrations included a table that projected policy values for a given set of premium payments that were more favorable to the policyholder than reasonable recent mortality experience, if John Hancock's story is to be believed. Each of these illustrations misrepresented the benefits and advantages of the policies by projecting future COI rates using

mortality and other assumptions that John Hancock knew were unreasonable, if its story is to be believed.

111.   These material misrepresentations are significant, and injured Plaintiffs PBR Partners and Trinity (including any predecessors-in-interest). Had JHNY complied with New York Insurance Law Section 4226, policyholders, including Plaintiffs PBR Partners and Trinity, would have been given far more advanced warning of the COI rate increases, so that policy owners, such as PBR Partners and Trinity and their predecessors-in-interest, would not have bought the policies at all or, if purchased after issuance, the purchasers would have paid much less for the policies, and could have stopped paying premiums earlier. JHNY's misleading illustrations induced PBR Partners and Trinity to continue to pay regular premiums to JHNY.

112.   JHNY knowingly violated New York Insurance Law Sections 4226(a) and (d) and/or knowingly received premiums and other compensation in consequence of such violation.

113.   Plaintiffs PBR Partners and Trinity and members of the New York Sub-Class have paid premiums for life insurance policies sold by an insurer authorized by the State of New York that nonetheless failed to comply with New York law governing representations made by such an authorized insurer. Plaintiffs PBR Partners and Trinity and members of the New York Sub-Class are therefore persons aggrieved under the statute as a result of JHNY's misrepresentations.

## THIRD CLAIM FOR RELIEF

### Violations of New York General Business Law § 349 (against JHNY on behalf of PBR Partners, Trinity, ATLES, and the New York Sub-Class)

114.    Plaintiffs reallege and incorporate all allegations of this Complaint as if fully set forth herein. This claim is brought on behalf of Plaintiffs PBR Partners, Trinity, and the New York Sub-Class.

115.     New York General Business Law Section 349 prohibits the use of deceptive acts or practices in the conduct of any business, including insurance, in the state of New York.

116.     If John Hancock's story is to be believed, JHNY engaged in deceptive acts and practices by knowingly applying unreasonably extreme and aggressive haircuts to the mortality tables when setting original pricing of the Subject Policies, which made John Hancock's product look substantially cheaper in the future than competitors' similar products and to gain market share. In this way, JHNY engaged in a bait-and-switch by projecting low future COI rates at initial pricing and in its illustrations, and then raising those rates after collecting hundreds of millions of dollars in premiums. If JHNY's story is to be believed, then JHNY would have known at policy issuance, and in recent years, that its future mortality expectations were too optimistic, and yet it continued to "project" future cheaper COI rates than its actual expectations permitted.

117.     And in fact, the NYDFS found that JHNY used unreasonable assumptions in marketing and pricing the Subject Policies, and made a regulatory finding that the "original pricing assumptions were aggressive and not reasonable," and that "[u]se of reasonable assumptions would have shown much greater expected future losses" than those advertised at policy issuance.

118.     JHNY willfully violated New York General Business Law Section 349 by providing misleading illustrations to policyholders in order to lure them to continue paying premiums under false pretenses.

119.     This conduct is likely to mislead and has misled reasonable consumers acting reasonably under the circumstances. JHNY's conduct is consumer-oriented and of a recurring nature. JHNY marketed and sold the Subject Policies to the public at large in New York pursuant to form insurance policies that are contracts of adhesion, and hundreds of policyholders have been affected.

120.    As a direct and proximate cause of violation of New York General Business Law Section 349, Plaintiffs PBR Partners, Trinity, and the New York Sub-Class have been damaged as alleged herein in an amount to be proven at trial.

121.    Plaintiffs PBR Partners and Trinity, on behalf of themselves and members of the New York Sub-Class, seek monetary damages, injunctive relief, as well as costs and reasonable attorneys' fees.

## FOURTH CLAIM FOR RELIEF

### Violations of California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 et seq. (against JHUSA on behalf of the Poplawski Plaintiffs, ATLES and the California Sub-Class)

122.    Plaintiffs reallege and incorporate all allegations of this complaint as if fully set forth herein. This claim is brought on behalf of the Poplawski Plaintiffs and the California Sub-Class.

123.    JHUSA committed acts of unfair competition in violation of California Business and Professional Code §§ 17200 et seq.

124.    Under the language of the policies, JHUSA offered flexible premiums that would allow policyholders to fund only enough premiums to cover the monthly deductions, that JHUSA would not raise the COI Rate and consequent monthly deduction except based on certain anticipated future expense factors stated in the policies and would not raise the cost of insurance in order to recoup past losses. JHUSA made those representations on its website and in its policies, marketing materials, and press releases.

125.    JHUSA has willfully violated California Business and Professional Code §§ 17200 *et seq.* by increasing COI Rates in order to recoup past losses despite assurances and representations that it would not do so. John Hancock's massive COI increases on policy holders

was part of an unfair and deceptive scheme designed to force policy lapses by virtue of burdensome premium increases – a tactic known in the industry as "shock lapses."

126.    The aforementioned conduct is likely to mislead and has misled reasonable consumers acting reasonably under the circumstances. For example, reasonable consumers expect that when they purchase flexible-premium universal life insurance, they need only pay the minimum premiums required to cover the COI charges and standard expense charges, and that COI rates will not be raised unless there has been a reasonable change in JHUSA's expectations of the enumerated factors, and that COI rates will not be raised to increase profits and shock lapse those policies that JHUSA believes it is more profitable for it to shock lapse. No reasonable consumer would expect that Defendants would increase rates in the face of improving mortality, force them to increase their policy values upon threat of massive COI increases, or otherwise force them to let their policies lapse in the face of such premium adjustments.

127.    If John Hancock's story is to be believed, JHUSA further engaged in an unfair business practice by knowingly applying unreasonably extreme and aggressive reductions to the mortality tables it used setting original pricing of the Subject Policies. JHUSA used those original pricing assumptions to make John Hancock's product look substantially cheaper in the future than the products of its competitors in order to gain market share. In this way, JHUSA engaged in a bait-and-switch: projecting lower future COI rates at initial pricing and in its illustrations sent through February 2018, and then raising those rates after collecting hundreds of millions in premiums. If JHUSA's story is to be believed, then JHUSA would have known at policy issuance, and in recent years, that its future mortality expectations were too optimistic, and yet it continued to "project" future cheaper COI rates than its actual expectations permitted.

128.    The NYDFS found JHUSA used unreasonable assumptions in marketing and pricing the Subject Policies, and made a regulatory finding that JHUSA's "original pricing assumptions were aggressive and not reasonable," and that "[u]se of reasonable assumptions would have shown much greater expected future losses" than those advertised at policy issuance.

129.    If John Hancock's story is to be believed, JHUSA engaged in additional unfair and deceptive business practices by providing to policy holders illustrations that depicted performance more favorable to the policy holder than would have been possible using a scale that was reasonably based on JHUSA's recent experience, and depicted COI rates to policy holders that were not reasonably based on "actual recent historical experience."

130.    At pricing and throughout the class period up until at least February 2018, John Hancock prepared and circulated false and misleading illustrations.  John Hancock provided false and misleading illustrations to members of the California Sub-Class (and any predecessors-in-interest) at least on or about the following dates: February 2014 for the Poplawski Plaintiffs; and June 2014 for an ATLES policy. On information and belief, each of these illustrations included a table that projected policy values for a given set of premium payments that were more favorable to the policyholder than reasonable recent mortality experience. Each of these illustrations deceptively misrepresented the benefits and advantages of the policies by projecting future COI rates using mortality and other assumptions that JHUSA knew were unreasonable, if its story is to be believed.

131.    These material misrepresentations are significant, and injured Plaintiffs (including their predecessors-in-interest). Had JHUSA not engaged in those deceptive business practices, the Poplawski Plaintiffs would have had far more advanced warning of the COI rate increases, so that policy owners, such as the Poplawski Plaintiffs, would not have bought the policy at all or, if

purchased after issuance, the purchaser would have paid much less for the policy, and could have stopped paying premiums earlier. JHUSA's misleading illustrations induced the Poplawski Plaintiffs to continue to pay regular premiums to JHUSA.

132.    JHUSA's conduct is consumer-oriented and of a recurring nature. JHUSA marketed and sold policies to the public at large in California pursuant to form insurance policies that are contracts of adhesion. At least hundreds of such policies have been sold and a substantial number of the policyholders have been affected, including many senior citizens and other persons with disabilities.

133.    As a direct proximate cause of violation of California Business and Professional Code §§ 17200 *et seq.*, the Poplawski Plaintiffs and members of the California Sub-Class have been damaged as alleged herein in an amount to be proven at trial.

134.    The Poplawski Plaintiffs, on behalf of themselves and members of the California Sub-Class, seek monetary damages and injunctive relief, including allowing reinstatement of policies that have lapsed or been surrendered following JHUSA's breach of contract, as well as costs and reasonable attorneys' fees.

### FIFTH CLAIM FOR RELIEF

### Violations of California Elder Abuse Statute, Cal. Welf. & Inst. Code §§ 15610 *et seq.* (against JHUSA on behalf of the Poplawski Plaintiffs and the California Elder Sub-Class)

135.    Plaintiffs reallege and incorporate all allegations of this complaint as if fully set forth herein. This claim is brought on behalf of the Poplawski Plaintiffs and the California Elder Sub-Class. The California Elder Sub-Class consists of all members of the COI Increase Class for which the insureds were age 65 or older when the policy was issued and were residents of California.

136.     This cause of action is brought under California's Welfare and Institutions Code §§ 15610 et seq. and California Civil Code § 3294.

137.     By imposing the COI Increase, JHUSA took, depleted, appropriated and/or retained the Poplawski Plaintiffs' and the California Sub-Class members' personal property in bad faith for a wrongful use and/or with the intent to defraud, which constitutes financial abuse as defined in California Welfare & Institutions Code § 15610.30.

138.     The insured, Ms. Poplawski, has used some of her own income to pay premiums on the policy. The COI increase made the voluntary transfer of Ms. Poplawski's assets much more expensive and of lesser value, and so her right to dispose of her property has been damaged.

139.     JHUSA is guilty of oppression, fraud, and malice in the commission of the above-described acts of abuse. At a minimum, JHUSA knew or should have known that its conduct was likely to be harmful to elders.

140.     Under California Civil Code § 3294, JHUSA is liable to the Poplawski Plaintiffs and the California Elder Sub-Class members for punitive damages.

141.     Under California Welfare & Institutions Code § 15657.5 Defendants are liable to the Poplawski Plaintiffs and the California Sub-Class members aged 65 years or older for reasonable attorney fees and costs.

## SIXTH CLAIM FOR RELIEF

### Violations of 28 Tex. Admin. Code §§ 21.2206 to 21.2212, Tex. Ins. Code art. 21.21 (against JHUSA on behalf of ATLES and the Texas Sub-Class)

142.     Plaintiffs reallege and incorporate all allegations of this complaint as if fully set forth herein. This claim is brought on behalf of ATLES and the Texas Sub-Class.

143.     Under the language of the policies, JHUSA offered flexible premiums that would allow policyholders to fund only enough premiums to cover the monthly deductions, that JHUSA

49

would not raise the COI Rate and consequent monthly deduction except based on certain anticipated future expense factors stated in the policies and would not raise the cost of insurance in order to recoup past losses. JHUSA made those representations on its website and in its policies, marketing materials, and press releases.

144.   JHUSA increased COI Rates in order to recoup past losses despite assurances and representations that it would not do so. John Hancock's massive COI increases on policy holders was part of an unfair and deceptive scheme designed to force policy lapses by virtue of burdensome premium increases—a tactic known in the industry as "shock lapses."

145.   The aforementioned conduct is likely to mislead and has misled reasonable consumers acting reasonably under the circumstances. For example, reasonable consumers expect that when they purchase flexible-premium universal life insurance, they need only pay the minimum premiums required to cover the COI charges and standard expense charges, and that COI rates will not be raised unless there has been a reasonable change in JHUSA's expectations of the enumerated factors, and that COI rates will not be raised to increase profits and shock lapse those policies that JHUSA believes it is more profitable for it to shock lapse. No reasonable consumer would expect that Defendants would increase rates in the face of improving mortality, force them to increase their policy values upon threat of massive COI increases, or otherwise force them to let their policies lapse in the face of such premium adjustments.

146.   If John Hancock's story is to be believed, JHUSA further engaged in an unfair business practice by knowingly applying unreasonably extreme and aggressive reductions to the mortality tables it used when setting original pricing of the Subject Policies. JHUSA used those original pricing assumptions to make John Hancock's product look substantially cheaper in the future than the products of its competitors in order to gain market share. In this way, JHUSA

engaged in a bait-and-switch: projecting lower future COI rates at initial pricing and in its illustrations sent through February 2018 and then raising those rates after collecting hundreds of millions in premiums. If JHUSA's story is to be believed, then JHUSA would have known at policy issuance, and in recent years, that its future mortality expectations were too optimistic, and yet it continued to "project" future cheaper COI rates than its actual expectations permitted.

147.   The NYDFS found JHUSA used unreasonable assumptions in marketing and pricing the Subject Policies, and concluded that JHUSA's "original pricing assumptions were aggressive and not reasonable," and that "[u]se of reasonable assumptions would have shown much greater expected future losses" than those advertised at policy issuance.

148.   If John Hancock's story is to be believed, JHUSA engaged in additional unfair and deceptive business practices by providing to policy holders illustrations that depicted performance more favorable to the policy holder than would have been possible using a scale that was reasonably based on JHUSA's recent experience, and depicted COI rates to policy holders that were not reasonably based on "actual recent historical experience."

149.   At pricing and throughout the class period up until at least February 2018, John Hancock prepared and circulated false and misleading illustrations. John Hancock prepared and circulated false and misleading illustrations to members of the Texas Sub-Class (and any predecessors-in-interest) at least on or about April 2015 for an ATLES policy. On information and belief, each of these illustrations included a table that projected policy values for a given set of premium payments that were more favorable to the policyholder than reasonable recent mortality experience. Each of these illustrations deceptively misrepresented the benefits and advantages of the policies by projecting future COI rates using mortality and other assumptions that JHUSA knew were unreasonable, if its story is to be believed.

150.     Pursuant to Tex. Ins. Code art. 21.21 § 16(b), ATLES and the Texas Sub-Class are entitled to (1) actual damages plus court costs and reasonable and necessary attorneys' fees, (2) treble damages for a knowing violation, (3) an injunction against the COI increase, and (4) any other relief that the court deems proper.

**SEVENTH CLAIM FOR RELIEF**

**Violations of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1 *et seq.*
(against JHUSA on behalf of Brighton Trustees, LLC, Cook Street Master Trust III,
ATLES, and the New Jersey Sub-Class)**

151.     Plaintiffs reallege and incorporate all allegations of this complaint as if fully set forth herein. This claim is brought on behalf of Brighton Trustees, LLC, Cook Street Master Trust III, ATLES, and the New Jersey Sub-Class.

152.     JHUSA's conduct constitutes an extremely sophisticated method of deception.

153.     JHUSA's actions as set forth above occurred in the conduct of trade or commerce.

154.     JHUSA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

155.     JHUSA intentionally and knowingly misrepresented material facts regarding its intent and ability to increase COI Rates and knowingly deceived policyholders and regulatory agencies or bodies by expressly and impliedly representing that cost of insurance charges would not be raised to recoup past losses when, in fact, they were, and, additionally, by their scheme, as alleged heretofore, to force or induce shock lapses by policyholders, including elderly Class Members.

156.     If John Hancock's story is to be believed, JHUSA engaged in additional unfair and deceptive business practices by providing to policy holders illustrations that depicted performance more favorable to the policy holder than would have been possible using a scale that was

reasonably based on JHUSA's recent experience, and depicted COI rates to policy holders that were not reasonably based on "actual recent historical experience."

157.    At pricing and throughout the class period up until at least February 2018, John Hancock prepared and circulated false and misleading illustrations.  John Hancock prepared and circulated false and misleading illustrations to members of the New Jersey Sub-Class (and any predecessors-in-interest) at least on or about October 2016 for an ATLES policy. On information and belief, each of these illustrations included a table that projected policy values for a given set of premium payments that were more favorable to the policyholder than reasonable recent mortality experience. Each of these illustrations deceptively misrepresented the benefits and advantages of the policies by projecting future COI rates using mortality and other assumptions that JHUSA knew were unreasonable, if its story is to be believed.

158.    JHUSA knew or should have known that its conduct violated the New Jersey Consumer Fraud Act.

159.    JHUSA owed Brighton Trustees, LLC, Cook Street Master Trust III, ATLES and the New Jersey Sub-Class a duty to disclose the truth at all times material.

160.    JHUSA's conduct has proximately caused injuries to Brighton Trustees, LLC, Cook Street Master Trust III, ATLES, and the other New Jersey Sub-Class members.

161.    JHUSA's conduct proximately caused injuries to Brighton Trustees, LLC, Cook Street Master Trust III, ATLES and the other New Jersey Sub-Class members.

162.    JHUSA's violations present a continuing risk to Brighton Trustees, LLC, Cook Street Master Trust III, ATLES, the New Jersey Sub-Class Members and the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

163.    Pursuant to N.J. Stat. Ann. § 56:8-20, Plaintiffs Brighton Trustees, LLC, Cook Street Master Trust III, and ATLES will serve the New Jersey Attorney General with a copy of this Amended Complaint within 10 days of filing.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

1.    Declaring this action to be a class action properly maintained pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure;

2.    Awarding Plaintiffs and the Classes (including Sub-Classes) compensatory damages, restitution, disgorgement, penalties, and any other relief permitted by law or equity pursuant to the First through Seventh Claims for Relief;

3.    Awarding Plaintiffs and the Classes (including Sub-Classes) pre-judgment and post-judgment interest pursuant to their First through Seventh Claims for Relief;

4.    Awarding Plaintiffs and the Classes (Including Sub-Classes) reasonable attorneys' fees, experts' fees, and costs, *see* New York General Business Law § 349(h); California Welfare and Institutions Code § 15657.5, Tex. Ins. Code art. 21.21 § 16(b), N.J. Stat. Ann. § 56:8-19;

5.    Awarding Plaintiffs, the COI Increase Class, and the Sub-Classes injunctive relief, preliminarily and permanently enjoining JHNY and JHUSA from:

(a) continuing to engage in the unlawful and unfair conduct;

(b) collecting the unlawfully and unfairly increased COI amounts in violation of the Policies and refusing to provide illustrations "upon request"; and

(c) ordering the reinstatement of any policy that was surrendered or terminated following Defendants' breach and unlawful conduct, as well as attorneys' fees and costs.

6. Awarding Plaintiffs and each of the Classes (including Sub-Classes) such other relief as set forth above and this Court may deem just and proper under the circumstances.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury as to all issues so triable.

Dated: March 6, 2020

    */s/Seth Ard*
Seth Ard
Ryan Kirkpatrick
Zachary B. Savage
Ari Ruben
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel.:   212-336-8330
Fax:    212-336-8340
sard@susmangodfrey.com
rkirkpatrick@susmangodfrey.com
zsavage@susmangodfrey.com
aruben@susmangodfrey.com

Steven Sklaver
Bryan Caforio
Glenn Bridgman
Richard Jolly
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel:    310-789-3100
Fax:    310-789-3150
ssklaver@susmangodfrey.com
bcaforio@susmangodfrey.com
gbridgman@susmangodfrey.com
rjolly@susmangodfrey.com

Andres Healy
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101
ahealy@susmangodfrey.com
Tel.:    (206) 516-3880
Fax:     (206) 516-3883
ahealy@susmangodfrey.com

*Attorneys for Plaintiffs*